IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

RANDALL MORRIS                                                    PLAINTIFF

v.                                  Civil No. 4:20-cv-04101

STEVEN KING, R.N.; WARDEN JEFFIE
WALKER; CAPTAIN GOLDEN ADAMS;
DR. KEVIN MCCAIN; SHERIFF JACKIE
RUNION; SGT. JASON GUTHRIE; SERGEANT
RICHARD HENDERSON; and CPL A. ELLIS                               DEFENDANTS

## REPORT AND RECOMMENDATION

This is a civil rights action filed *pro* se by Plaintiff, Randall Morris, under 42 U.S.C. §

1983.  Before the Court is a Motion for Summary Judgment, Brief in Support, and a Statement of

Facts filed by Defendants Steven King and Kevin McCann.[1] (ECF Nos. 172, 173, 174).[2]  Plaintiff

has filed a Response to the motion, a Brief in Support, a Statement of Facts, and an Affidavit. (ECF

Nos. 206, 207, 208, 209).   Defendants have filed a Reply. (ECF No. 219). Pursuant to the

provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, Chief United

States District Judge, referred this case to the undersigned for the purpose of making a Report and

Recommendation.

## I. FACTUAL BACKROUND

Plaintiff is currently incarcerated in the Saline County Detention Center ("SCDC").  His

claims in this action arise from alleged incidents which occurred while he was incarcerated in the

---

[1] Defendant McCann is incorrectly referred to on the Court's docket as "Kevin McCain".

[2] Defendants Walker, Adams, Runion, Henderson, Guthrie, and Ellis ("County Defendants") also filed a Motion for Summary Judgment, Brief in Support, Statement of Facts, and a Reply.  (ECF Nos. 182, 183, 184, 218).  This motion will be addressed in a separate order. However, the Court will consider the relevant portions of the medical records, grievances, and other exhibits set forth in the pleadings filed by the County Defendants and cite to them as necessary in this Report and Recommendation.

Miller County Detention Center ("MCDC") in Texarkana, Arkansas.

Plaintiff was booked into the custody of the MCDC on January 10, 2020, where he remained until he was transferred to the SCDC on March 24, 2021. (ECF No. 209, p.1).

On his Screening and Intake Questionnaire for Medical/Mental Health, (ECF No. 201, p. 2, ECF No. 206-6 p. 17), when asked if he had any serious medical condition that may require attention while he was at the MCDC Plaintiff answered "Yes" and stated he had "Titanium in his back". *Id.* In addition, Plaintiff stated he suffered from a mental health condition known as misophonia.[3] *Id.* He stated he was not taking any medications that might need to be continued while at the MCDC. *Id.* At that time his blood pressure was 124/77, his weight was 227 lbs., and his temperature was 98.8 degrees. In the medical history section, there is a checkmark under the "No" column for diabetes and hypertension. (ECF No. 206-6, p. 20).

On January 13, 2020, Plaintiff submitted the following request:

> I requested PC upon intake on Friday, 1/20/20, and was put into A pod on a bottom bunk. I had written on all of the intake forms that I am a disabled Vet, suffer from PTSD, suffer from Misophonia, I cannot climb into a top bunk. I also stated all of this to the intake nurse on 1/10/20. I was moved to this pod today and given a top bunk. As I cannot climb and as my PTSD/Misophonia causes me extreme reactions to crowds and loud noises I am desperately requesting PC.

(ECF No. 206-2, p. 21). The following day Sergeant Rogers responded "DONE". *Id.*

In his Affidavit, Plaintiff states he is fifty-five (55) years old and is classified by the Veterans Administration and the Social Security Administration as being disabled. He states his medical disabilities include paraplegia, diabetes, hypertension and misophonia. (ECF No. 209, p. 1).[4] He also states, "Upon intake at MCDC, I recorded that I am a disabled veteran and listed my

---

[3] Misophonia is defined as a disorder in which certain sounds trigger emotional or physiological responses that some might perceive an unreasonable given the circumstances. https://www.webmd.com.

[4] Plaintiff's statements are supported by documentation received from the Veterans Administration Department

disabilities on all MCDC intake forms." *Id.*

On March 2, 2020, according to the affidavit of Defendant Walker – Warden of the MCDC, he and Defendant Runion – Sheriff of Miller County, instituted precautionary measures and procedures for the threat posed by the Covid-19 virus. (ECF No. 182-1, p. 2). He goes to state on or around March 3, 2020, the Arkansas Department of Health notified law enforcement of the potential threat of Covid-19. On March 23, 2020, the MCDC promulgated the Standard Operating Procedure 05.00 Pandemic and Public Health Emergency. *Id.*

According to Defendant Walker, Procedure 05.00 applies to all MCDC staff and sets out guidance for the use of Personal Protective Equipment ("PPE"), Isolation, and Quarantine of inmates. (ECF No. 182-1, p. 2). The policies implemented were designed to educate staff on CDC, State, and Local Department of Health Guidelines; appropriate quarantine and isolation of inmates; appropriate use of PPE; implementation of temperature checks; cleaning and disinfecting of jail surfaces; and limiting the transmission of Covid-19 by suspending fingerprinting, property releases, and lobby visitation. *Id.*

Defendant Walker goes on to state these policies were to be implemented by phases, depending on the ebb and flow of the pandemic. Phase One was implemented on April 30, 2020. Phase Two was implemented on May 27, 2020. Phase One was reactivated on June 17, 2020. Phase Two was reactivated on September 10, 2020. (ECF No. 182-1, p. 2).

According to Plaintiff's affidavit, MCDC "guards began to wear face masks and sometimes gloves for the first time due to the threat of Covid-19...beginning of May, 2020, MCDC personnel, to include all three nurses, began to consistently disregard the proper wearing of PPE while

---

produced in response to a subpoena from this Court. (ECF No. 206-7, pp. 5-10).

interacting with inmates and dispensing medications." (ECF No. 209, p. 2).

Plaintiff also states, "prior to 8/1/2020, I had not filed many serious grievances and nor had I experienced any retaliatory treatment from anyone." (ECF No. 209, p. 4). Plaintiff goes on to state:

> However, some of the responses to my August, 2020, grievances contained snarkiness and hostility instead of concern for the issues that I had expressed in those grievances. In fact, the written responses from Capt. Adams and Head Nurse Steven King are a fundamental basis for my claim of retaliation regarding most all of my claims that transpired thereafter. The grievances that were not answered with hostile responses were simply ignored and 'closed' without response or responded to with not/generic 'copy & paste' non-responses and then closed without investigation or correction of the offending acts/omission and living conditions.

*Id.* at pp. 4-5.

According to the affidavit of Defendant King, he is a nurse employed by Southern Health Partners, Inc. which is the company who provides medical services to inmates housed at the MCDC. (ECF No. 173-3). He states he reviewed and is familiar with Plaintiff's medical file and the sick call requests and grievances submitted by him. He states Plaintiff placed 17 sick calls and 251 grievances using the MCDC's kiosk system while he was housed there. *Id.* at p. 2.

Defendant King also states while Plaintiff was in the MCDC Plaintiff did not test positive for Covid-19, contract Covid-19, or demonstrate symptoms of Covid-19. (ECF No. 173-3, p. 2). Plaintiff admits he never tested positive for the virus but claims he was only tested once and at some point, during his incarceration in the MCDC, he exhibited cold-like symptoms which could have been Covid-19. (ECF No. 208 at p. 3).[5]

Defendant King also testifies during Plaintiff's incarceration in the MCDC there was no

---

[5] It is not clear from Plaintiff's pleadings exactly when he allegedly exhibited Covid symptoms and the Court has not been able to locate a medical request or sick call submitted by Plaintiff in connection with these symptoms.

medical indication to test Plaintiff's blood sugar and Plaintiff never registered a blood pressure reading that would have required intervention or treatment. (ECF No. 173-3, p. 2).

On September 6, 2020, Plaintiff submitted a medical request asking, "Will we have access to flu shots? If not, can we pay to get it?" (ECF No. 201, p. 18). Defendant King responded one minute later stating, "Yes, flu shots will be available per request, no charge." *Id.* Two days later, Plaintiff submitted another medical request asking, "How and when should I request a flu shot?" *Id.* at p. 19. One minute later, Defendant King responded, "I will let all inmates know when it is available." *Id.* Defendant King also states any delay in administering influenza and pneumonia vaccines was due to a delay in delivery of the vaccines to the MCDC, and that the vaccines were administered to all inmates who requested them at or near the same time. He also states Plaintiff never contracted influenza or pneumonia at the MCDC. (ECF No. 173-3, p. 2).

Plaintiff first requested mental health services on September 22, 2020. (ECF No. 173-3, p. 2). Plaintiff stated, "Please add me to the list to see the mental health provider." (ECF No. 201, p. 20). Defendant King responded to the request an hour and fifteen minutes later stating, "After reading your request, we're having a hard time figuring out what your complaint is. Please resubmit stating exactly what you would like to be seen for. Mental health comes once a week and we prioritize the patients she sees. So please let us know why you need to see her. Depression? Anxiety? Medications?" *Id.*

On October 2, 2020, between 8:53 a.m. and 9:33 a.m., Plaintiff submitted five medical requests to Defendant King detailing his frustration with the kiosk system, the difficulty Plaintiff believed Mr. King's initial response to his first medical request to see mental health created, and his difficult conditions of confinement. (ECF No. 201, pp. 21-25). In one of these medical requests, Plaintiff states:

> So I wrote Nurse King a physical note on 9/24 & 9/28 explaining this problem [with the kiosk operation] requesting to see mental health and providing the reasons for my request…I have not heard anything as to whether I have been added to the list for this Saturday, 10/3 and I do not know why I was not added to the list last week to see mental health on 9/26 despite my having requested it on 9/22 and despite my having sent the handwritten note explain my reasons on 9/26."

(ECF No. 201, p. 23).  That same day at 11:09 a.m., Defendant King responded to all these requests as follows:

> You're in protective custody at your request due to your charges Mr. Morris. It is not medical's fault you are in the position in life you are in. If you do not want to be on protective custody you can request a move from administration at any time. Hope this helps explain why your are housed where you are the steps you can take to remedy that. With that said, I've added you to the list to speak with the mental health nurse.

> Also, we will not be adjusting our policy concerning kiosk time to suit one inmate. You are the only inmate who seems to have a problem correctly requesting medical services. However, considering you just submitted 5 messages it seems you have this kiosk think figured out. On a side note, you were added to the list on 9-29-20, 3 days ago. The mental health nurse only comes for 8 hours on Saturday. So you've been on this list, she just hasn't came yet.

(ECF No. 201, p. 25).

Plaintiff was seen by the mental health nurse on October 3, 2020, October 10, 2020, October 17, 2020, and November 7, 2020.  *Id.*  In his affidavit, King states during the height of the Covid-19 pandemic in 2020, there were more than the usual number of requests for mental health services by inmates at the MCDC. *Id.*

On October 9, 2020, at 11:26 a.m., Plaintiff submitted the following medical request:

> I am not able to properly exercise wearing the jail issue footwear because they are not tied/secured to my feet and I am diagnosed as a T-6 paraplegic (incomplete) by the VA and suffer from peripheral neurothopy in both feet. As such, I cannot feel the bottoms of my feet and my jail footwear pose as trip hazards if I try to walk fast in order to exercise. If you do not have my VA health file I do have supporting VA documents with me. What can be done? There is not other exercise options in E Pod.

(ECF No. 201, p. 27). Less than an hour later, Defendant King responded stating, "Please submit a sickcall stating exactly what you need medical treatment for in the infirmary. You cannot just request shoes. *Id.*

In his affidavit, Plaintiff states on October 12, 2020, he sent a letter to Defendant Walker describing his physical and mental deterioration, his VA disabilities, his need for secure shoes to accommodate his paraplegia and his need for outside yard time exercise. (ECF No. 209, p. 8).

On October 14, 2020, Plaintiff submitted a medical request stating, "Requesting sick call for back and neck problems, peripheral neuropathy, muscular-skeletal pain, tendon/ligament tightening and join pain. I also want to have my weight, blood sugar and blood pressure checked." (ECF No. 201, p. 29). Defendant King responded ten minutes later stating, "You've been placed on the list to see the doctor during his next visit." *Id.*

Plaintiff was seen by Defendant McCann on October 15, 2020. He approved an order for Plaintiff's medical shoes that same day. (ECF No. 173-3, p. 2). Plaintiff describes this event in his affidavit as follows:

> On 10/15/2020, I was taken to the infirmary for the appointment with the doctor which discovery would later reveal was a Nurse practitioner and not a doctor. Upon entering the infirmary Nurse Steven King aggressively confronted me and asked, 'what are those papers in your hand?' I responded that the papers were my VA medical documents that I would need to show the 'doctor' to assist with my request for accommodation of my disabilities if SHP did not possess my VA medical records and that these were the same documents referenced in my medical request. Nurse King then yelled, 'you can't have that in the infirmary.' King then instructed C.O. Crane, who had witnessed this, to, 'Take him back to his cell and have him put those papers up then bring him back to the infirmary.'…
>
> After I was escorted back to the infirmary, I was placed into a chair facing NP Kevin McCann and with Head Nurse Steven King seated about 6 foot to my extreme left. I asked NP MCann if my VA medical file had been obtained and he confirmed that it had not. I explained to NP McCann that I am disabled and that I am in need of secure footwear to accommodate my disability and in order to meaningfully exercise.

Nurse King angrily interjected, 'He doesn't need shoes. Everybody wants shoes!'

Only after I was able to verbally provide sufficient clinical details regarding my spinal cord injury and paraplegia was I able to convince NP McCann to authorize me secure shoes. This appeared to anger Nurse King and he began to question why I was in 'protective custody' stating that I had requested 'pc', 'due to your charges'. I pointed out that I had listed my age, disabilities and misophonia as my reasons for 'pc' on all intake forms and requests.

NP McCann then diagnosed open bleeding sores within both my nostrils.

As the doctor appointment progressed to my other health concerns, Nurse King repeatedly interrupted the doctor to bring the discussion back to my disabilities, my need for secure shoes and my reasons for requesting 'pc'. It was if he could not let it go, could not accept that I had been granted shoes and was determined to minimize and downplay my needs.

While I was describing some pain issues with NP McCann, Nurse King interrupted again with, 'It's not true that you can't exercise in 'pc', Mr. Morris. You could do bunk squats. Isn't that right, Mr. Morris?' At this point I asked NP McCann 'why am I being subjected to this especially since I am being told what I can physically do after being stripped of my medical document?'

Nurse King then jumped to his feet, began pacing while pointing at me and yelled, 'who do you think you are?! You are not in the free world, you are a convict! You are not as smart as you think you are and you can go and write that up!' (referring to my grievances) I stared at the floor during this tirade.

Once Nurse King had finished and had sat back down, I continued discussing my health issues with NP McCann. Nurse King interjected again a couple minutes later with, 'you could do elevated arm twirls in 'pc' or you could always request to be moved to an open pod for better exercise options, right Mr. Morris? Right?'. I was shocked and was finding it hard to breath so I stared down at the floor while king continued, 'Right, Mr. Morris? Isn't that right?'

As I did not rise to the bait and verbally respond to it, Nurse King turned to the guard and commanded, 'I want him written up for disrespect!' He then added, 'once you write him up he can't stay in Max E.' (King was referring to me being moved from 'protective custody' to Max A which was King's Covid-19 quarantine pod that was simultaneously being used for disciplinary lockdown containing violent inmates)

Before I was escorted out I asked Nurse King for the blood pressure, blood sugar and weight check that I had requested on the kiosk medical request. Nurse King

responded, 'No', then ordered the guard to, 'Get him out of here.' All of this was witnessed by NP Kevin McCann without his intervention or any attempt to intervene…With this denial of medical as well as the termination of my medical appointment before I was able to address all of my health issues with NP McCann, I was led back to my cell in Max E and nothing further happened that day.

(ECF No. 209, pp. 9-12).

Plaintiff describes what happened the following morning – October 16, 2020:

…I was sitting on my bunk reading when Nurse King dispensed medications. After Nurse King handed my cellmate…his meds and then looked around and then behind…and saw me sitting on my bunk reading, king appeared to be surprised that I had not been moved to Max A pod. A couple hours later, the guards came and took me to Max A pod and put me into a dimly lit and extremely humid cell with a violent inmate that was on disciplinary lockdown. This pod was simultaneously being used as a Covid-19 quarantine pod.

(ECF No. 209, p. 13).

In his affidavit Defendant King states he does not set the policies for inmates in protective custody or their kiosk hours. (ECF No. 173-3, p. 2). In addition, he states he understands Plaintiff claims he placed a mentally ill inmate in his pod as a retaliatory measure. However, Defendant King states he had no control or authority over where any alleged mentally ill inmate was placed in the MCDC. *Id.*

Defendant King goes on to state he was not a policy maker over which inmates were housed with other inmates, nor in which pod inmates were housed. The only exception to this was as the medical team administrator, he did have some input into the housing and quarantine of Covid positive inmates. *Id.* at p. 3. Defendant King also states he does not set disciplinary policy at the MCDC. (ECF No. 173-3, p. 2).

In addition, Defendant King states he is also familiar with the Covid-19 policies and procedures implemented at the MCDC. *Id.* Defendant King states Plaintiff placed 4 sick call requests and 117 grievances after October 15, 2020. (ECF No. 173-3, p. 1).

9

According to the affidavit of Defendant McCann, he was an independent nurse practitioner providing medical services to inmates housed at the MCDC, by and through a contract with Southern Health Partners, Inc. (ECF No. 173-4). He states on October 15, 2020, he placed an order for Plaintiff to receive special medical shoes due to his peripheral neuropathy. That same day, while he was seeing Plaintiff, Plaintiff was removed to a disciplinary pod for disrespectful behavior. *Id.*

Defendant McCann states he was not a policymaker as to the housing and segregation of inmates, or inmates times and access to the kiosk system, and he never had the authority to place any inmate in the pod or cell with Plaintiff. *Id.* Defendant McCann goes on to testify he has no recollection of Plaintiff requesting a blood sugar check or anything other than medical shoes for his peripheral neuropathy on October 15, 2020. In addition, he states he did not, at any time, withhold medical care from Plaintiff. (ECF No. 173-4).

According to the affidavit of Defendant Walker, Plaintiff was placed into disciplinary segregation because of disrespectful behavior while he was in the infirmary on October 15, 2020. (ECF No. 182-1, p. 1). Plaintiff was given a disciplinary hearing on October 21, 2020, at which time he was found guilty and sentenced to time served. *Id.*

In his affidavit Plaintiff describes the disciplinary hearing as follows:

On 10/21/2020, I was shackled and handcuffed and then led into Capt. Adams's office for the disciplinary hearing at 3:00pm. The only people in that hearing were Capt. Adams, Sgt. Henderson and me…During the disciplinary hearing I asked Capt. Adams if video surveillance exists in the infirmary and whether he had viewed the video incident from 10/15/2020 involving King and I. Capt. Adams responded that he had reviewed the video.

I then read my 16 page statement and offered Capt. Adams a copy of it. He declined but stated, 'But keep it handy in case I want to revisit anything.' That 16 page statement included transcriptions of my grievances against the nurses and Nurse King's snarky and hostile responses. The statement also transcribed King's

> language towards me in the infirmary to include the statement, 'you can go and write that up.' (referring to my grievances).
>
> During the disciplinary hearing, I was not told what my actual infraction was, there was no written statement from my accuser and my accuser was not named, there were no staff witness statements from the guards or NP McCann and there were no witnesses or even my accuser present at the hearing to tesify against me or for me to cross-examine. There were also no video or audio recordings shown, played or otherwise used or referenced against me.
>
> At the conclusion of the 10/21/2020 disciplinary hearing…Capt. Adams stated, 'I'm going to take a couple of days to kick this around a bit and I'll get back to you on the outcome.'
>
> With no conclusion to the hearing, I was led out of the disciplinary hearing and was given all of my commissary and privileges as well as my first hour outside yard time since I had arrived at MCDC 10 months prior. While I was outside in the yard, the lights in my dark cell were replaced.

(ECF No. 209, pp. 14-16). Plaintiff goes on to state he wrote his federal defense attorney a letter confirming what had occurred during the hearing and "…Capt. Adams had given the impression that I had prevailed but that I was not given any written conclusion of the hearing". *Id.* at p. 16.

Plaintiff also states in his affidavit, "Despite the retaliation [by Defendant King], I continued to document and file grievances on the kiosk when MCDC staff and nurses disregarded Covid-19 protocol and PPE." (ECF No. 209, p. 16).

According to the affidavit of Defendant Adams – the hearing officer for the disciplinary hearings at the MCDC – Plaintiff had a disciplinary hearing in front of him during which he says "Plaintiff may have read a statement…it was not attached as part of the record and thus listed as 'no' documentation. I recall him reading something but do not recall it being attached and normally such statements are not." (ECF No. 173-1, p. 2). He states Plaintiff was found guilty, which carried a 30-sanction, but Plaintiff was given his time served. Defendant Adams goes on to state this "is not unusual for a first disciplinary offenders. Ultimately, he served less than 5 days. On October

16, 2021, as a result of the disciplinary, Morris was moved to Max Pod Block Max A Cell 804 and after the hearing on October 20, 2020, he was moved back to Max Pod Block Max E Cell 12. During that time, he did not have commissary but it was restored on October 20, 2020." *Id.*

On December 29, 2020, at his yearly check up at the MCDC, Plaintiff weighed 250.8 lbs. and his blood pressure was 142/86. (ECF No. 209, p. 12, ECF No. 206-9, p. 59).

On January 6, 2021, Plaintiff received a flu shot which was administered by Defendant King. (ECF No. 201, p. 3).  In his affidavit, Plaintiff states, "MCDC did not offer inmate flu shots until 1/6/2021 or a mere 72 days before Spring despite the urging of health officials, the early and wide availability of the flu shots and the dangerous threat of Covid-19 in the absence of a Covid vaccine." (ECF No. 209, p 20).

Plaintiff states, "on 2/24/2021 I wrote kiosk request … asking Capt. Adams about the final disposition of the 10/21/20 disciplinary hearing and why I had not received anything yet. He responded that he would check on it but he did not get back to me." (ECF No. 209, p. 20). Plaintiff also states on March 9, 2021, he wrote another kiosk request to Defendant Adams asking again about the final disposition of the October 21, 2020, disciplinary hearing. He goes on to state Defendant Adams "responded that he would look into it. He never did and this was my last inquiry to him about this before being abruptly transferred out of MCDC on 3/24/2021." *Id.* at p. 22.

In his affidavit Plaintiff states in June of 2021, through discovery in the instant lawsuit, Defendants provided him with the "Disciplinary Hearing Finding document…the 'finding' was 'guilty' and it stated the hearing started at 10:08 am and that a Deputy K. Watson served me the guilty finding at 2:00 pm on 10/21/2020 and advised me of a 15 day appeal process". (ECF No. 209, p. 22). Plaintiff disputes the time of the hearing and states Watson was not even at work that day and never provided him with the disciplinary finding. *Id.*

According to Defendant Walker, on March 25, 2021, Miller County began working to vaccinate inmates against Covid 19. (ECF No. 182-1, p. 3).

## II. PROCEDURAL BACKGROUND

Plaintiff filed his original Complaint on November 18, 2020.[6]  (ECF No. 1).  On December 17, 2020, in response to this Court's order, Plaintiff filed an Amended Complaint to clarify his claims. (ECF No. 9). On January 25, 2021, Plaintiff filed a Supplement to the Amended Complaint adding claims for retaliation and denial of medical care against two additional Defendants.  (ECF No. 13).

On February 5, 2021, Plaintiff filed a Motion to Join seeking to add seven additional claims and "join these claims with 21 other cases that bring similar claims" filed by other prisoners.  (ECF No. 17).    On February 8, 2021, the Court denied Plaintiff's motion stating Plaintiff may not "bootstrap" his claims with those in other cases, Plaintiff did not adequately describe the claims he was attempting to add and did not clearly identify any Defendants as being responsible for the alleged claims.  (ECF No. 18).  In this order the Court instructed Plaintiff to file a Second Amended Complaint which would replace the First Amended Complaint and Supplement.

On February 24, 2021, Plaintiff filed a Second Amended Complaint which consists of thirty-eight (38) pages asserting seventeen (17) claims against eight (8) Defendants.  (ECF No. 21).  Plaintiff labels his claims against Defendants King and McCann as follows: (1) False Allegation with Malicious Intent to Harm/Retaliation against Defendant King; (2) Malicious Denial of Medical Care as a Retaliatory and Punitive Measure against Defendant King; (3) Malicious Hinderance to Mental Health Care as a Retaliatory and Punitive Measure against

---

[6] The original Complaint consisted of eighty-five (85) pages which was confusing, included unnecessary and irrelevant information and was, for the most part incomprehensible.

Defendant King; (4) Failure to Protect or Intervene against Defendant McCann; (5) Malicious Violation of the Americans with Disabilities Act against Defendant King; (6) Malicious Violation of the Rehabilitation Act against Defendant King; (8) Deliberate and Reckless Disregard to an Imminent Threat and Future Harm against Defendant King; (9) Hindered Access to Medical Requests (sick call) against Defendant King; (12) Failure to Provide Medical Care against Defendant King; (14) Prolonged Exposure to Extreme Behavior of Severely Mentally Ill Inmates against Defendant King; (15) Retaliation against Defendant King arising from the same facts set forth in Claim 14; (16) Failure to Protect against Defendant King arising from the same facts set forth in Claim 8; and (17) Failure to Train and Supervise against Defendant King arising from the same facts as set forth in Claim 8.  *Id.*

On December 21, 2021, Defendants King and McCann filed a Motion for Summary Judgment arguing they are entitled to summary judgment because: 1) Defendant King did not retaliate against Plaintiff for filing grievances by charging him with a disciplinary infraction on October 15, 2022; 2) neither Defendant King nor McCann retaliated against him for filing grievances by denying him medical care; 3) Defendant King did not retaliate against Plaintiff nor did he deny his access to mental health care; 4) Defendant McCann did not fail to intervene or protect him from Defendant King's alleged verbal attack on October 15, 2020; 5) Defendants did not violate the American with Disabilities Act or Rehabilitation Act; 6) Defendant King was not deliberately indifferent to any threat of future harm to Plaintiff relating to Covid 19; 7) Defendants did not hinder Plaintiff's access to the kiosk system for sick calls; 8) Defendants did not withhold influenza and pneumonia vaccines from Plaintiff; 9) Defendants had no control or authority over where a mentally ill inmate was placed in the MCDC; 10) Plaintiff fails to state any claim against Defendants for failure to train or supervise; 11) Plaintiff did not suffer any physical injuries as

14

required for recovery of compensatory damages; and 12) Plaintiff cannot prove Defendants followed a policy or custom that violated his constitutional rights. (ECF Nos. 172, 173).

On February 2, 2022, Plaintiff filed a verified Response in opposition to Defendants' motion, a Brief in Support, a Statement of Facts, and a Supplement which consists of a 26-page Affidavit.[7] (ECF Nos. 206, 207, 208, 209). He argues he was "repeatedly subjected to deplorable conditions and the threat of Covid-19 through a combination of actions (some through deliberate indifference and some as retaliatory for Plaintiff's continuous grievances and letters to the warden complaining of those acts and conditions)." (ECF No. 206). Plaintiff also argues he suffered physical and emotional damage and Defendants are not entitled to summary judgment.

Defendants King and McCann filed a Reply (ECF No. 219) which incorporated the Reply filed by the County Defendants (ECF No. 218). Defendants argue, in part, that Plaintiff's Affidavit contains "lots of allegations, the vast majority unsupported, speculative, or general conclusory statements. These are improper and self-serving, and it is not an admissible form of evidence. Defendants argue the Court should disregard the inadmissible portions of Plaintiff's Affidavit. *Id.* at pp. 2-3.

### III. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the

---

[7] These pleadings addressed not only Defendant King and McCann's summary judgment motion, but also the motion for summary judgment filed by the County Defendants.

non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing, *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Under § 1983, a defendant may be sued in either his personal capacity, or in his official capacity, or claims may be stated against a defendant in both his personal and his official capacities. *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998). To state a claim under 42 U.S.C. § 1983, Plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability on the part of a defendant, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [his] constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (citation and internal quotation marks omitted). The deprivation must be intentional; mere negligence will not

suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010). When a government contracts with a third-party to fulfill a constitutional duty – such as providing medical care - official-capacity claims against the third-party's employees are treated as claims against the third-party itself. *See Cannady v. Cradduck*, 2016 WL 4432704, at *1-*2 (W.D. Ark. Aug. 18, 2016) (finding that official-capacity claims against employees of a third-party medical provider are treated as claims against the company because Benton County contracted with the company to provide healthcare to County prisoners).

To sustain an official capacity claim against such an entity a plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006) (involving a § 1983 claim against a prison medical provider); *Sanders v. Sears, Roebuck & Co*., 984 F.2d 972, 975-76 (8th Cir. 1993) ("[A] corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies."). Thus, Plaintiff's official capacity claims against Defendants King and McCann are "functionally equivalent" to alleging their employer, Southern Health Partners, Inc., had "a policy, custom, or [took an] official action" that deprived him of constitutionally adequate medical care. *Veatch,* 627 F.3d at 1275*; Johnson*, 452 F.3d at 973.

To establish a claim for "custom" liability, Plaintiff must demonstrate:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the official of that misconduct; and

3)  That Plaintiff was injured by acts pursuant to the government entity's custom,
i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas County Medical Dept.,* 725 F.3d 825, p.  (8th Cir. 2013). "A single deviation

from a written, official policy does not prove a conflicting custom." *Id.* (quoting *Jane Doe A v.*

*Special Sch. Dist. of St. Louis,* 901 F.2d 642, 646 (8th Cir. 1990)).

## IV.  DISCUSSION

Plaintiff asserts twelve claims against Defendant King and one claim against Defendant

McCann. He is suing Defendants in their individual and official capacities.

### A.  Claim One – False Allegation with Malicious Intent to Harm/Retaliation

Plaintiff alleges during a "doctor appointment" on October 15, 2020, Defendant King

"falsely accused him of disrespect" which caused him to be removed from "protective custody

without a review or hearing and placed into a disciplinary pod with violent inmates and inmates

who had Covid-19 even though King knew that I have elevated health risks and he knew that I had

just been diagnosed with open/bleeding sores in both nostrils." (ECF No. 21, p. 7).  Plaintiff also

alleges Defendant King had been "brow beating and badgering" him while he was attempting to

discuss his medical issues with Defendant McCann. He goes on to state, "as a result of my inability

to respond to his badgering King ordered me 'written up' on a disciplinary knowing that that I

could be harmed." *Id.* Plaintiff states after that he was afraid "to request medical or mental care at

MCDC…and I prevailed against this false allegation at the subsequent (belated) disciplinary

hearing on 10/21/20." *Id.* at p. 8.

First, Plaintiff's allegations relating to Defendant King's "brow beating and badgering"

fails to state a constitutional claim. It is well established that "verbal threats do not constitute a

constitutional violation."  *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985).  Similarly,

taunts, name calling, and the use of offensive language does not state a claim of constitutional dimension. *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993) (inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) (verbal threats and abuse by jail official did not rise to the level of a constitutional violation).

Next, Plaintiff alleges Defendant King retaliated against him by falsely accusing him of disrespect because of the grievances he filed. The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity. *Dixon v. Brown*, 38 F.3d 379 (8th Cir. 1994). Generally, "[c]onduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason." *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001) (citing *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990)). The retaliatory conduct itself need not be a constitutional violation to be actionable. Additionally, there is no independent injury requirement when retaliatory conduct is involved. *See Dixon*, 38 F.3d at 380 (8th Cir. 1994).

To prevail on his retaliation claim, Plaintiff must demonstrate: (1) he engaged in protected activity; (2) Defendants responded with adverse action that would "'chill a person of ordinary firmness' from continuing in the activity;" and (3) the adverse action was motivated at least in part by exercise of the protected action. *See L.L. Nelson Enterprise Inc. v. County of St. Louis, Mo.*, 673 F.3d 799, 807-808 (8th Cir. 2012) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). Here, Plaintiff clearly engaged in protected activity when he filed grievances. However, the record is equally clear Plaintiff continued to file grievances, often daily, after Defendant King allegedly charged him with the disciplinary violation. Accordingly, Defendant King's action of charging Plaintiff with a disciplinary violation did not "chill" him from continuing in the activity.

Finally, retaliation claims fail "if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule." *Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008). Therefore, "a defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation." *Id.* "[A] report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as 'some evidence' upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker." *Id.* at 831. The summary judgment record confirms Plaintiff appeared at his disciplinary hearing and was permitted to read his sixteen page statement. According to the affidavit of Defendant Adams, Plaintiff was found guilty of "disrespect" and given a punishment of time served (approximately 5 days) which is typical for a first-time disciplinary violation.

Accordingly, Plaintiff's personal capacity claims under Claim One for retaliation, false accusations of disrespect, and verbal abuse fail as a matter of law and Defendant King should be granted summary judgment on these claims.

Plaintiff describes his official capacity claim under Claim One as follows:

> Custom or Policy: King lets it be known that the infirmary is 'his' infirmary and he frequently abuses those that dare to file grievances against him through verbal assaults that humiliate and demean as well as retaliatory disciplinary punishments. "Disrespect' is one of the false accusations that Steven King often misuses. I have inmate statements which when combined with my experience, will show a pattern of abuse and bullying. My presentation will also show that he MCDC grievance process is a 'dead end'."

(ECF No. 21, p. 8). Plaintiff does not identify any specific policy or custom of Defendant Southern Health Partners Inc. that violated his rights.  Merely alleging Defendant King violated his constitutional rights or failed to adhere to "established policy" does not state a constitutional claim. *Walton v. Dawson*, 752 F.3d 1109 (8th Cir. 2014); *Edwards v. Baer*, 863 F.3d 606, 608 (8th Cir.

1988). Accordingly, Plaintiff's official capacity claims against Defendant King under Claim One should be dismissed.

**B.  Claim Two – Malicious Denial of Medical Care as a Retaliatory and Punitive Measure**

In Claim Two Plaintiff makes allegations which overlap in part with those in Claim One. He claims Defendant King violated his rights by denying him medical care and retaliating against him. He specifically states, "During a doctor appointment Steven King stripped me of my medical documentation confirming my VA disability, attempted to deprive me of secure footwear to accommodate my disability, refused to check my blood pressure, blood sugar and weight…". (ECF No. 21, p. 9).

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to the serious medical needs of prisoners. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012).  To prevail on his Eighth Amendment claim, Plaintiff must prove Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).  The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted).  To establish the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more

21

even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.  Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Medical Services,* 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted).  A plaintiff must show that an official "actually knew of but deliberately disregarded his serious medical need." *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006).  However, intentionally denying or delaying access to medical care may constitute deliberate indifference.  *See Estelle,* 429 U.S. at 104-05; *Dulany*, 132 F.3d at 1239.

First, although Plaintiff was diagnosed years ago by the Veterans Administration as suffering from hypertension and diabetes, Plaintiff has not submitted any summary judgement evidence he suffered from these serious medical conditions during his incarceration at the MCDC. The summary judgment record shows that at the time Plaintiff was booked into the MCDC Plaintiff's medical records confirm his blood pressure was 124/77 and he was not taking any medications for high blood pressure or diabetes. Then in December of 2020 at his yearly check up, Plaintiff's blood pressure was 142/86. Even though his blood pressure was higher than when he was first booked into the MCDC, Plaintiff was not prescribed any medication for his blood pressure.

Even if the Court were to assume, *arguendo*, that he suffered from serious medical needs, there is no evidence to indicate Defendant King was deliberately indifferent to those needs when he ordered Plaintiff to be moved to disciplinary segregation before his blood pressure and blood sugar could be checked on October 15, 2020. At most, Plaintiff's claim could be construed as one for a delay in providing medical treatment. When a delay in medical treatment is the alleged constitutional deprivation, the objective seriousness of the deprivation must also be measured by

reference to the effect of delay in treatment.  As a result, to succeed on a delay in medical treatment claim, the plaintiff "must place verifying medical evidence in the records to establish the detrimental effect of delay in medical treatment."  *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (quotation marks omitted) (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)).

On summary judgment, a plaintiff must offer evidence a delay in treatment had a detrimental effect.  In the absence of such evidence, a plaintiff "fail[s] to raise a genuine issue of fact on an essential element of his claim."  *Id.*   Here, Plaintiff has not produced any summary judgment evidence to show he suffered any detrimental effect from not having his blood pressure or blood sugar checked on October 15, 2020. Accordingly, Defendant King is entitled to summary judgment on Claim Two for denial of medical care.

Likewise, Plaintiff's allegations that Defendant King retaliated against him by denying him medical care fails. Plaintiff continued to file medical requests after the October 15, 2020, incident. For the reasons set forth in the previous section Defendant King is also entitled to summary judgment on that portion of Claim Two.

Plaintiff describes his official capacity claim under Claim Two as follows:

> As with the custom/policy described in Claim #1, King frequently weaponizes the medical 'care' in 'his' infirmary and he verbally abuses, bullies, badgers and dominate inmates in front of the doctor during doctor appointment. I have inmate statement and will call inmate witnesses who have had this experience. The Southern Health Partners, Inc., nurses practice a frequent custom of ordering punishment upon MCDC inmates.

(ECF No. 21, p. 9). Plaintiff's allegations here mirror those set forth in Claim One. For the same reasons set forth previously, Defendant King is entitled to summary judgment on Plaintiff's official capacity claim in Claim Two.

23

**C. Claim Three – Malicious Hinderance to Mental Health Care as a Retaliatory and Punitive Measure**

Plaintiff alleges Defendant King violated his right to mental health care and retaliated against him for filing grievances. He specially alleges:

> My plainly worded and timely sick call requests to access mental health care were intentionally, maliciously and frivolously hindered/blocked by Steven King through an invented 'prioritization' requirement that is selective, unnecessary, unevenly applied and specifically designed to selectively impede access to mental health care. I also have mental health requests from other inmates that will clearly show that my requests were blocked unfairly and a numb of snarky responses by Steven King to my grievances against Steven King will tie this act to retaliation.

(ECF No. 21, p. 11). This claim is without merit. The summary judgment record demonstrates Plaintiff was seen and evaluated by mental health at the MCDC on four different occasions. Plaintiff submitted his first request on September 22, 2020 and Defendant King asked him to clarify what he was wanting to be seen for (i.e. depression, anxiety, medications). His first mental health visit was on October 3, 2020, followed by visits on October 10, 17, and November 7, 2020.

On the facts presented here, the Court concludes while Plaintiff did not receive the care from Defendants he may have wanted as soon as he wanted it, the care he received was constitutionally sufficient. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (Eighth Amendment does not require that prisoners receive "unqualified access to health care"). The "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.,* 557 F.3d 628, 633 (8th Cir. 2009). Accordingly, Defendant King is entitled to summary judgment on Plaintiff's personal capacity claim against him under Claim Three for hinderance to mental health care.

Plaintiff describes his official claim under Claim Three stating, "The written responses by Steven King to my medical requests clearly show that he is asserting a policy when

24

hindering/blocking my mental health requests, Yet the same requests from other inmates will show that King does not invoke this policy." (ECF No. 21, p. 11). Plaintiff has not pointed to any policy or custom of Southern Health Partners, Inc. which resulted in any constitutional violations of his rights. Accordingly, Defendant King is also entitled to summary judgment on Plaintiff official capacity claim under Claim Three.

### D. Claim Four - Failure to Protect/Intervene

In Claim Four, Plaintiff alleges Defendant McCann violated his constitutional rights when he witnessed Defendant King "brow beat and verbally assaulted me during a doctor appointment on 10.15…attempted to sabotage my medical request for accommodation of my disability, deny me medical care (blood pressure, blood sugar and weight check) falsely accuse me of disrespect…" and "At no time did Dr. McCann intervene to protect me during or after this event. (ECF No. 21, p. 13).

Prison officials must provide humane conditions of confinement, including protecting inmates from violence. *See Jensen v. Clarke,* 94 F.3d 1191, 1197 (8th Cir. 1996). However, the Eighth Circuit has not recognized a duty to intervene to prevent any constitutional violations outside of the excessive force context. *Livers v. Schenck,* 700 F.3d 340, 360 (8th Cir. 2012); *Hess v. Ables,* 714 F.3d 1048, 1052 (8th Cir. 2013). Plaintiff does not make any allegations of excessive physical force against Defendant King. Instead, he claims Defendant King verbally abused him, denied him medical care, and falsely accused him of disrespect. As previously stated, the Court is recommending these claims be dismissed. Accordingly, Defendant McCann is entitled to summary judgment on Plaintiff's personal capacity claim against him for failure to protect or intervene.

For his official capacity claim, Plaintiff only describes alleged policies of the MCDC. He does not describe any policies of Defendant McCann's employer – Southern Health Partners, Inc.

(ECF No. 21, p. 13). Accordingly, Plaintiff has failed to state any official capacity claim against Defendant McCann.

### E.  Claims Five and Six – Malicious Violation of the Americans with Disabilities Act and Rehabilitation Act

Plaintiff alleges Defendant King violated the Americans with Disabilities Act and Rehabilitation Act. Plaintiff specifically states:

> MCDC and Southern Health Partners, Inc., were sufficiently informed on 1/10/20 that I am disabled and covered by the VA health care system yet as of 10/15/20 they had failed to order my VA medical file. Furthermore, Nurse King was informed by Warden Jeffie Walker of my letter dated 10/12/20 to her wherein I described my need for secure footwear in order to safely walk and exercise as I am a T-6 paraplegic (incomplete). In that 10/12 letter and in medical requests to King I stated that I have VA medical documents with me and that I need to see a doctor in order to obtain secure footwear.
>
> On 10/15/20 and armed with the above information, Nurse King intentionally and maliciously stripped me of my VA disability documents before my appointment with the doctor and then proceeded to prevent and sabotage my efforts to verbally convince the doctor that I have a bonafide disability and a legitimate need for secure footwear by dismissing my disability and stating, 'he doesn't need shoe. Everybody wants shoes.'

(ECF No. 21, p. 15).

Plaintiff describes his official capacity claim under Claim Five as follows:

> Nurse King stated that bringing documents to the doctor appointment is 'not allowed' thus implying policy. Southern Health Partners, Inc., does not order health files even after having been given 10 months notice of a disability and a need to reasonable accommodate that disability. This policy or custom should be considered together with the custom of retaliation that I have described in Claim #1, #2, and #3 as this claim is also a result of retaliation against my grievances by Nurse King.

(ECF No. 15, p. 15).

In Claim Six, Plaintiff names Defendant King as one of the defendants involved in violating the Rehabilitation Act and refers to the acts and omissions he describes in Claim Five for violation

of the American with Disabilities Act.  (ECF No. 21, p. 17). For his official capacity claim under Claim Six he states, "same as Claim #5 (ADA)".  *Id.*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The United States Supreme Court has held that Title II, which prohibits a "public entity" from discriminating against a "qualified individual with a disability" on account of that individual's disability, includes inmates in state prisons.  *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 208 (1998).

In order to state  a claim under Title II of the ADA, a plaintiff must allege (1) he is a qualified individual with a disability; (2) he was excluded from participation in or denied the benefits of the [prison's] services, programs, or activities, or was otherwise subjected to discrimination by the [prison]; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability. *Rinehart v. Weitzell,* 964 F.3d 684, 688 (8th Cir. 2020).

Section 504 of the Rehabilitation Act provides in relevant part that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance [.]" 29 U.S.C. § 794. "To prevail on a claim under § 504, a plaintiff must demonstrate: (1) he is a qualified individual with a disability; (2) he was denied the benefits of a program or activity of a public entity which receives federal funds; and (3) he was discriminated against based on his disability." *Gorman v. Bartch,* 152 F.3d 907, 911 (8th Cir. 1998) (footnote omitted) (citing § 794(a)). Although

the ADA has no federal funding requirement, 'it is otherwise similar in substance to the Rehabilitation Act, and 'cases interpreting either are applicable and interchangeable.'" *Gorman,* 152 F.3d at 912 (quoting *Allison v. Dep't of Corr.,* 94 F.3d 494, 497 (8th Cir. 1996)).

The Court will assume for purposes of this Report and Recommendation that Plaintiff is a qualified individual with a disability. However, Plaintiff has not alleged he was denied the benefits of a program or activity of a public entity or he was discriminated against based on his disability. Failure by Defendant King or Southern Health Partners, Inc. to order Plaintiff's file from the Veteran's Administration did not deny Plaintiff any benefits. Likewise, Defendant King's verbal comments during the October 15, 2020, appointment with Defendant McCann did not result in any denial of any benefit of a program or activity at the MCDC.

The summary judgment record confirms Plaintiff requested special medical shoes on October 9, 2020, so he could engage in meaningful exercise. This request was approved on October 15, 2020.  There is no evidence Plaintiff was discriminated against based on any disability by Defendant King in either his personal or official capacities.  Therefore, Plaintiff has failed to state a claim against Defendant King based on a violation of the ADA or the Rehabilitation Act.

**F. Claims Eight, Sixteen, and Seventeen – Deliberate and Reckless Disregard to an Imminent Threat and Future Harm, Failure to Protect, and Failure to Train and Supervise**

In Claims Eight and Sixteen, Plaintiff alleges Defendant King and others deliberately and recklessly disregarded an imminent threat and future harm to him and failed to protect him from Covid 19. In Claim Seventeen, Plaintiff claims Defendant King "failed to train and supervise".  He specifically describes the facts underlying these personal capacity claims as follows:

> We have been continuously exposed to the threat of irreparable harm on a daily basis since March, 2020, due to MCDC's failures to test for Covid-19, failure to re-test for Covid-19 after infections were discovered on 7/6/20, failure to report and

contact trace after 3 MCDC staff tested positive for Covid-19 within the first 2 weeks of June, 2020, (Studdard, Crane & Morgan) dishonest press releases to local newspapers designed to hide Covid-19 infections in MCDC, failure to decrease the MCDC inmate population to allow room for Covid-19 quarantine (MCDC is overcrowded for months with inmates sleeping on floors) deliberate disregard for PPE by MCDC staff on a daily basis, failures to provide adequate sanitation/disinfectants, failure to consistently take inmate temperatures, falsification of inmate temperatures, failure to consistently provide face masks to inmates and failure repair the inoperable emergency 'panic' buttons within all of the Max A and Max E 23/1 lockdown cells.

(ECF No. 21, p. 20).

Plaintiff describes the facts underlying his official capacity claims under Claims Eight, Sixteen, and Seventeen as follows:

The countless grievances and letters to the Warden over many months by inmates and myself detailing the daily infractions and the fact that all of these grievances/letters were ignored should sufficiently establish the custom of deliberate and reckless indifference to inmate safety and future harm and that the MCDC grievance process is a 'dead end' and when the above infractions are viewed in their totality they will easily rise to the level of constitution violation.

*Id.*[8]

In determining whether an action fails to state a claim upon which relief can be granted, the Court must engage in a two-step inquiry. First, the Court must identify the allegations in the complaint that are not entitled to the assumption of truth. *Ashcroft v. Iqbal,* 566 U.S. 662 (2009). These include "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements." *Id.* at 678. Second, the Court must determine

---

[8] In Claim Sixteen Plaintiff alleges Defendant King and others failed to protect him. He describes this claim as follows: "Date of Occurrence: "3/1/20 until present (it is ongoing)…Defendant(s) … Head Nurse Steven King…Acts and Omissions: same as described in Claim #8: Deliberate and Reckless Disregard to an Imminent Threat/Future harm". (ECF No. 21, p. 37). He also describes his official capacity claim as, "Same as described in Claim 8". *Id.* In Claim Seventeen, Plaintiff alleges Defendant King failed to train and supervise. He again refers back to the acts and omissions "same as described in Claim #8: Deliberate and Reckless Disregard to an Imminent Threat/Future Harm" for his individual capacity claim against Defendant King. He also states his official capacity claim against King is the "same as described in Claim #8". (ECF No 21, p. 38).

whether the complaint states a plausible claim for relief. *Id.* at 679. A plaintiff is required to plead facts that show more than the "mere possibility of misconduct." *Id.*

Other than listing Defendant King as one of the individuals involved which is purely a legal conclusion, Plaintiff does not make any specific allegations – in a personal or official capacity - against Defendant King in Claims Eight, Sixteen or Seventeen. The Court also notes Plaintiff never tested positive for Covid 19 while incarcerated at the MCDC and never submitted any sick calls relating to any physical conditions other than his paraplegia and a request to have his weight, blood pressure, and blood sugar checked. Accordingly, Plaintiff has failed to state any claims for relief against Defendant King under Claims Eight, Sixteen, or Seventeen and Defendant King should be granted summary judgment on those claims.

### G. Claim Nine – Hindered Access to Medical Request (sick calls)

Plaintiff alleges Defendant King hindered his ability to submit sick calls. He specifically alleges:

> Despite my many medical requests, grievances and 2 handwritten notes to Nurse King MCDC continues to hinder inmates in 'protective custody' and disciplinary 23/1 lockdown from timely accessing the kiosk medical request sick call process by closing the medical request system at 12:00 noon every day. Inmates that are in lockdown are only allowed out of the cell to use the kiosk for 1 hour per day and the way that they alternate which cells are let out before noon each day translates to each cell getting out before noon on only 1 to 2 days per week.

> MCDC responds to our complaints by stating that there are paper sick call requests available upon request but we do not receive them when we request them. I have written Nurse King several times about the significant delays that I have incurred in getting scheduled for sick call due to this noon cut off on the kiosk but his written response have been snarky, taunting and indifferent.

(ECF No. 21, p. 24).

Plaintiff describes his official capacity claim for Claim Nine as follows:

> In one of the snarky kiosk responses from Nurse King he wrote, "we will not
> change our policy to suit one inmate. But seeing as you just filed 5 medical
> requests to medical it seems as though you have the kiosk thing figured out.' His
> response does confirm that a policy exists. My presentation will also show the
> MCDC grievance process to be a 'dead end'.

(ECF No. 21, p. 24).

Plaintiff's personal and official capacity claims that Defendant King "hindered" his ability
to submit sick calls through the MCDC's kiosk system are without merit and undermined by the
summary judgment evidence. First, the record confirms Plaintiff submitted 17 sick calls and 251
grievances between January 10, 2020, and March 24, 2021. Second, although Plaintiff claims he
experienced delays in getting scheduled to be seen for sick call, he has not presented any medically
verified evidence to show these delays caused him any detrimental effect.  Third, although there
exists a policy which requires MCDC inmates to submit sick calls through a kiosk system, there is
no evidence to substantiate this policy was a moving force behind any constitutional violation or
that the policy was attributable to Southern Health Partners, Inc. In fact, Defendant King states in
his affidavit he did not set the policies for inmates in protective custody or their kiosk hours.
Accordingly, Defendant King is entitled to summary judgment on Plaintiff's personal and official
capacity claims involving hindering access to sick calls.

### H.  Claim Twelve – Failure to Provide Medical/Future Harm

Plaintiff alleges his constitutional rights were violated because he was never provided a
pneumonia shot and the influenza shot he did receive was "finally given…with just 72 days left
before Spring …". (ECF No. 21, p. 30). Plaintiff describes his official capacity claim under Claim
Twelve as follows:

> The written responses to my medical requests by Head Nurse King and the verbal
> assurance by Warden Walker during a 9/10/20 meeting in her office regarding my
> letter to her dated 9/9 point to a policy of MCDC and Southern Health Partners,

31

Inc., to provide influenza and pneumonia vaccinations to MCDC inmates. Not only could the flu and pneumonia be dangerous to me but as MCDC does not test for Covid there is a very real risk that I could be moved to a pod containing inmates exhibiting Covid symptoms if I were to contract the flu or pneumonia and exhibit Covid-like symptoms…

(ECF No. 21, p. 30).

The summary judgment record confirms Plaintiff did not contract the flu or pneumonia during his time at the MCDC. Moreover, Plaintiff did receive a flu shot even though he argues it was given to him too late. Although there is some confusion in the record as to whether the MCDC or Southern Health Partners, Inc. had a policy to provide pneumonia shots to inmates, this discrepancy does not support any claim for denial of medical care by Defendant King or Southern Health Partners, Inc. Plaintiff has not provided the Court with any medically verifiable evidence that a delay in giving him either vaccination caused him any damage.

As previously stated, although Plaintiff has a constitutional right to adequate health care, he does not have the right to health care of his choice. *See Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118-19 (an inmate has no constitutional right to a particular course of treatment). In addition, failure to follow a policy does not, by itself, violate a constitutional right. Accordingly, Defendant King is entitled to summary judgment on the personal and official capacity claims set forth in Claim 12.

## I.   Claim Fourteen – Prolonged Exposure to Extreme Behavior of Severely Mentally Ill Inmates

Plaintiff alleges Defendant King subjected him to unlawful conditions of confinement when "a mentally ill inmate was placed in my pod (Max E lockdown) in July through August, 2020, causing me to file grievances due to the feces and urine that I was exposed to." (ECF No. 21, p. 32). Plaintiff goes on to allege:

> On 12/19/21 another mentally ill inmate… was placed into my pod in cell ME 13….I along with other inmates in Max E Pod filed multiple desperate grievances regarding the incessant screaming, wailing, crying and banging by [the inmate] … that was depriving us of sleep and driving us nuts… We also complained of the feces and urine from Harris that we were being exposed to… [the inmate] was finally moved to a 'psych'cell on 1/1/21…[the inmate] was returned to Max E Pod and immediately began to scream incessantly and beat upon cell doors which is particularly torturous to me as I suffer from misophonia…

*Id.* For his official capacity claim, Plaintiff states Southern Health Partners, Inc. "ha[s] a custom of indiscriminately and also deliberately housing mentally ill inmates together with inmates in protective custody and disciplinary lockdown and they ignore the resulting complaints of excessive noise, sleep deprivation and sanitation issues." (ECF No. 21, p. 33).

Other than listing Defendant King as one of the Defendants on page 32 under Claim Fourteen, Plaintiff does not describe how Defendant King was involved in placing mentally ill inmates in his pod. Moreover, Defendant King states in his affidavit he "had no control or authority over where the alleged mentally ill inmate was placed in the MCDC." (ECF No. 173-3, p. 2).

There is no summary judgment evidence that Defendant King or Southern Health Partners, Inc. had any involvement in where mentally ill inmates are housed in the MCDC. Accordingly, Defendant King is entitled to summary judgment on both in the personal and official capacity claims under Claim Fourteen.

### J.   Claim Fifteen- Retaliation for Prolonged Exposure to Mentally Ill Inmates

Plaintiff describes the acts and omissions to support his individual and official capacity claims under Claim 15 against Defendant King and other MCDC officers as: 1) "They are exactly as described in Claim #14: prolonged Exposure to Extreme Behavior of Severely Mentally Ill Inmates" (ECF No. 21, p. 35); and 2) "It is exactly as I described in Claim #14 with the additional

point that MCDC engages in and condones retaliation against those that file grievances and civil suits." *Id.* at p. 36.

For the same reasons discussed under Claim Fourteen, Plaintiff fails to state any claims for retaliation against Defendant King in either his individual or official capacities. Plaintiff has not described any facts to demonstrate Defendant King or Southern Health Partners, Inc. were personally involved in deciding where mentally ill inmates are housed in the MCDC.

### V. CONCLUSION

For the reasons stated above, I recommend Defendant King and McCann's Motion for Summary Judgment (ECF No. 172) be **GRANTED** and all personal and official capacity claims against these Defendants be **DISMISSED WITH PREJUDICE.**

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 22nd day of June 2022.

/s/ *Barry A. Bryant*
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE