IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

RANDALL MORRIS                                                                    PLAINTIFF

v.                                         Civil No. 4:20-cv-04101

STEVEN KING, R.N.; WARDEN JEFFIE
WALKER; CAPTAIN GOLDEN ADAMS;
DR. KEVIN MCCAIN; SHERIFF JACKIE
RUNION; SGT. JASON GUTHRIE; SERGEANT
RICHARD HENDERSON; and CPL A. ELLIS                                  DEFENDANTS

## REPORT AND RECOMMENDATION

This is a civil rights action filed *pro se* by Plaintiff, Randall Morris, under 42 U.S.C. §

1983.  Before the Court is a Motion for Summary Judgment filed by Defendants Walker, Adams,

Runion, Guthrie, Henderson, and Ellis ("County Defendants"). (ECF No. 182).[1]  Plaintiff has filed

a Response to the motion (ECF No. 206) and Defendants have filed a Reply. (ECF No. 218).

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey,

Chief United States District Judge, referred this case to the undersigned for the purpose of making

a Report and Recommendation.

## I. FACTUAL BACKROUND

Plaintiff is currently incarcerated in the Garland County Detention Center.  His claims in

this action arise from alleged incidents which occurred while he was incarcerated in the Miller

County Detention Center ("MCDC") in Texarkana, Arkansas.

At all times relevant to the instant lawsuit, Defendant Walker was the Warden at the

---

[1] Defendants King and McCann ("Medical Defendants") also filed a Motion for Summary Judgment, Brief in Support, Statement of Facts, and a Reply.  (ECF Nos. 172, 173, 174, 219).  On June 22, 2022, the Court entered a Report and Recommendation recommending the Medical Defendants be granted summary judgment. (ECF No. 227). The Court will consider the relevant portions of the medical records, grievances, and other exhibits set forth in the pleadings filed by the Medical Defendants and cite to them as necessary in this Report and Recommendation.

MCDC, Defendant Runion was the Sheriff of Miller County, Arkansas, Defendant Adams was a Captain at the MCDC, Defendant Henderson was a Sergeant at the MCDC, Defendant Guthrie was a Sergeant at the MCDC, and Defendant Ellis was a Corporal at the MCDC. (ECF Nos. 21, 79, 182-1, 182-7).

Plaintiff was booked into the custody of the MCDC on January 10, 2020, where he remained until he was transferred to the Saline County Detention Center ("SCDC") on March 24, 2021. (ECF No. 209, p.1).

On his Screening and Intake Questionnaire for Medical/Mental Health, (ECF No. 201, p. 2, ECF No. 206-6 p. 17), Plaintiff identified two serious medical conditions which could require attention while he was at the MCDC: "Titanium in his back" and a mental health condition known as misophonia.[2] *Id.* He also stated he was not taking any medications. *Id.* At intake his blood pressure was 124/77, and he weighed 227 pounds. In the medical history section, there is a checkmark under the "No" column for diabetes and hypertension. (ECF No. 206-6, p. 20).

According to the affidavit of Defendant Walker, MCDC has a contract with Southern Health Partners, Inc. to provide health services to the inmates. He goes on to state the MCDC relies upon them "in this regard". (ECF No. 182-1).

On January 13, 2020, Plaintiff submitted the following request:

I requested PC upon intake on Friday, 1/20/20, and was put into A pod on a bottom bunk. I had written on all of the intake forms that I am a disabled Vet, suffer from PTSD, suffer from Misophonia, I cannot climb into a top bunk. I also stated all of this to the intake nurse on 1/10/20. I was moved to this pod today and given a top bunk. As I cannot climb and as my PTSD/Misophonia causes me extreme reactions to crowds and loud noises I am desperately requesting PC.

---

[2] Misophonia is defined as a disorder in which certain sounds trigger emotional or physiological responses that some might perceive an unreasonable given the circumstances. https://www.webmd.com.

(ECF No. 206-2, p. 21).

Plaintiff states he is fifty-five (55) years old and is classified by the Veterans Administration and the Social Security Administration as being disabled. He states his medical disabilities include paraplegia, diabetes, hypertension and misophonia. (ECF No. 209, p. 1).

On March 2, 2020, Defendants Walker and Runion instituted precautionary measures and procedures for the threat posed by the Covid-19 virus. (ECF No. 182-1, p. 2). On March 3, 2020, the Arkansas Department of Health notified law enforcement of the potential threat of Covid-19. On March 23, 2020, the MCDC promulgated the Standard Operating Procedure 05.00 Pandemic and Public Health Emergency. *Id.* Procedure 05.00 applies to all MCDC staff and sets out guidance for the use of Personal Protective Equipment ("PPE"), isolation, and quarantine of inmates. (ECF No. 182-1, p. 2). The policies implemented were designed to educate staff on CDC, State, and Local Department of Health Guidelines; appropriate quarantine and isolation of inmates; appropriate use of PPE; implementation of temperature checks; cleaning and disinfecting of jail surfaces; and limiting the transmission of Covid-19 by suspending fingerprinting, property releases, and lobby visitation. *Id.*

Defendant Walker states these policies were to be implemented by phases, depending on the ebb and flow of the pandemic. Phase One was implemented on April 30, 2020. Phase Two was implemented on May 27, 2020. Phase One was reactivated on June 17, 2020. Phase Two was reactivated on September 10, 2020. (ECF No. 182-1, p. 2). Defendant Walker also testified:

> the policies and procedures, as promulgated, were based on the evolving science as it was understood at the time. The policies and procedures represent a good-faith effort to limit the spread of the Covid-19 virus within the MCDC. MCDC employees were provided with copies of all the policies and procedures. Supervisors were explained the policies and procedures and [they then] explained them to the jail staff. At shift change, the jail staff had a briefing about the day and that briefing would include any changes to protocol as a result of Covid-19. I as

well as my Captains and Jail Administrator were available to answer questions of jail staff. Training on Covid-19 was a daily effort, as what was known about the virus was changing daily.

(ECF No. 182-1, p. 3).

Plaintiff states MCDC "guards began to wear face masks and sometimes gloves for the first time due to the threat of Covid-19...beginning of May, 2020, MCDC personnel...began to consistently disregard the proper wearing of PPE while interacting with inmates and dispensing medications." (ECF No. 209, p. 2). On July 1, 2020, the MCDC "performed the first and only mass Covid 19 testing of all inmates and staff." *Id.* at p. 3. On "July 6, 2020, the mass Covid-19 tests from 7/1/2020 revealed 85 Covid-19 infections and those infected individuals were isolated. However, no further testing or contact tracing was performed despite the fact that these 85 infected individuals had intermingled and cohabitated with the general inmate population during the 5 day wait for the Covid test results". *Id.*

Plaintiff states in his affidavit, "prior to 8/1/2020, I had not filed many serious grievances nor had I experienced any retaliatory treatment from anyone." (ECF No. 209, p. 4).

Plaintiff also states:

As the indifference towards PPE and sanitation became even more chronic and deplorable, I wrote the Warden a five page letter on 9/9/2020 detailing the imminent threats to my health as well as the ineffectiveness of the MCDC kiosk grievance system.

Warden Walker summoned me to her office on 9/10/2020 in response to my letter, whereupon, she told me that 'you can't catch Covid like that', 'my people have to be able to breathe' (referring to their not wearing masks), she doesn't listen to the current news developments concerning Covid-19 'because it's so conflicted… Nothing was resolved concerning to the existing conditions and nothing changed going forward as my continued grievances show.

(ECF No. 209, 5-6).

According to the affidavit of Defendant Walker, Plaintiff placed 17 sick calls and 251

4

grievances using the MCDC's kiosk system while he was housed there. (ECF No. 182-1, p. 4). Defendant Walker states while Plaintiff was in the MCDC Plaintiff did not test positive for Covid-19, contract Covid-19, or demonstrate symptoms of Covid-19. (ECF No. 182-1, p. 3).

Plaintiff admits he never tested positive for the Covid-19 virus but claims he was only tested once and at some point, during his incarceration in the MCDC, he exhibited cold-like symptoms which could have been Covid-19. (ECF No. 208 at p. 3).

During his deposition, Plaintiff admitted he was allowed outside his cell into the day room. He only alleges he was not always given outside yard time. (ECF No. 182-8, p. 19). Defendant Walker testified:

> Plaintiff was housed in the protective custody pod at his own request. Protective custody inmates are let out of the cell for 1 hour every day so they can exercise in the day room or use the kiosk. Weather and logistics providing (that is, if it can be done and still stay in protective custody), time in the yard is provided but is not guaranteed. Plaintiff was given the opportunity, especially after complaining about other inmates in the pod, to move to a pod of older males. He declined to do so, until the last part of his detention at Miller County. This pod would have taken him out of protective custody and given him more time out of the cell and less restrictions.

(ECF No. 182-1, p. 4).

On September 6, 2020, Plaintiff submitted a medical request asking, "Will we have access to flu shots? If not, can we pay to get it?" (ECF No. 201, p. 18). Defendant King responded one minute later stating, "Yes, flu shots will be available per request, no charge." *Id.* Two days later, Plaintiff submitted another medical request asking, "How and when should I request a flu shot?" *Id.* at p. 19. One minute later, Defendant King responded, "I will let all inmates know when it is available." *Id.*

Plaintiff first requested mental health services on September 22, 2020. (ECF No. 173-3, p. 2).

On October 9, 2020, at 11:26 a.m., Plaintiff submitted the following medical request:

I am not able to properly exercise wearing the jail issue footwear because they are not tied/secured to my feet and I am diagnosed as a T-6 paraplegic (incomplete) by the VA and suffer from peripheral neurothopy in both feet. As such, I cannot feel the bottoms of my feet and my jail footwear pose as trip hazards if I try to walk fast in order to exercise. If you do not have my VA health file I do have supporting VA documents with me. What can be done? There is not other exercise options in E Pod.

(ECF No. 201, p. 27).

On October 12, 2020, Plaintiff sent a letter to Defendant Walker describing his physical and mental deterioration, his VA disabilities, his need for secure shoes to accommodate his paraplegia and his need for outside yard time exercise "as the 'pc' dayroom was a small 35'x 16' room with stainless steel tables blocking the way of meaningful exercise. (I had lived this way for 10 months at this point)." (ECF No. 209, p. 8).

On October 14, 2020, Plaintiff submitted a medical request stating, "Requesting sick call for back and neck problems, peripheral neuropathy, muscular-skeletal pain, tendon/ligament tightening and join pain. I also want to have my weight, blood sugar and blood pressure checked." (ECF No. 201, p. 29). Defendant King responded ten minutes later stating, "You've been placed on the list to see the doctor during his next visit." *Id.*

On October 15, 2020, Plaintiff was seen by Defendant McCann who approved an order for Plaintiff's medical shoes that same day. (ECF No. 173-3, p. 2). During this appointment, Plaintiff alleges Defendant King yelled at him, made him return his Veteran's Administration medical records to his cell, refused to allow Defendant McCann to check his blood pressure and blood sugar, and falsely accused him of disrespect. (ECF No. 209, pp. 9-12).

Defendant King testified during Plaintiff's incarceration in the MCDC there was no medical indication to test Plaintiff's blood sugar and Plaintiff never registered a blood pressure

reading that would have required intervention or treatment. (ECF No. 173-3, p. 2).

Plaintiff states on the morning of October 16, 2020, "…the guards came and took me to Max A pod and put me into a dimly lit and extremely humid cell with a violent inmate that was on disciplinary lockdown. This pod was simultaneously being used as a Covid-19 quarantine pod." (ECF No. 209, p. 13).

Defendant Walker testified Plaintiff was placed into disciplinary segregation on October 16, 2020, because of disrespectful behavior while he was in the infirmary on October 15, 2020. (ECF No. 182-1, p. 1). Plaintiff was given a disciplinary hearing on October 21, 2020, at which time he was found guilty and sentenced to time served. *Id.*

Plaintiff describes the disciplinary hearing as follows:

On 10/21/2020, I was shackled and handcuffed and then led into Capt. Adams's office for the disciplinary hearing at 3:00pm. The only people in that hearing were Capt. Adams, Sgt. Henderson and me…

I then read my 16 page statement and offered Capt. Adams a copy of it. He declined but stated, 'But keep it handy in case I want to revisit anything.' That 16 page statement included transcriptions of my grievances against the nurses and Nurse King's snarky and hostile responses. The statement also transcribed King's language towards me in the infirmary to include the statement, 'you can go and write that up.' (referring to my grievances).

During the disciplinary hearing, I was not told what my actual infraction was, there was no written statement from my accuser and my accuser was not named, there were no staff witness statements from the guards or NP McCann and there were no witnesses or even my accuser present at the hearing to testify against me or for me to cross-examine. There were also no video or audio recordings shown, played or otherwise used or referenced against me.

At the conclusion of the 10/21/2020 disciplinary hearing…Capt. Adams stated, 'I'm going to take a couple of days to kick this around a bit and I'll get back to you on the outcome.'

With no conclusion to the hearing, I was led out of the disciplinary hearing and was given all of my commissary and privileges as well as my first hour outside yard time since I had arrived at MCDC 10 months prior. While I was outside in the yard,

the lights in my dark cell were replaced.

(ECF No. 209, pp. 14-16). Plaintiff goes on to state "…Capt. Adams had given the impression that I had prevailed but I was not given any written conclusion of the hearing". *Id.* at p. 16.

According to the affidavit of Defendant Adams – the hearing officer for the disciplinary hearings at the MCDC – Plaintiff was found guilty, which carried a 30-sanction, but Plaintiff was given his time served. Defendant Adams states this "is not unusual for first disciplinary offenders. Ultimately, he served less than 5 days. On October 16, 2021, as a result of the disciplinary, Morris was moved to Max Pod Block Max A Cell 804 and after the hearing on October 20, 2020, he was moved back to Max Pod Block Max E Cell 12. During that time, he did not have commissary but it was restored on October 20, 2020." (ECF No. 173-1, p. 2).

According to Plaintiff's affidavit:

…November 6, 2020 began a continuous day stretch of our deprivation of the opportunity to clean our cells. I began writing daily grievances during this time to document this extreme deprivation. Each kiosk grievance was responded to with the same note copy/paste non-response: 'we appreciate your concern regarding sanitation. Please keep in mind that you are responsible for the cleanliness of your area. We can assure you that adequate cleaning supplies are readily available upon request from the unit officer.'

A few of the grievances and requests for sanitation were responded to by Cpl. A. Ellis. His typical response was, 'I will take your request into consideration' and then do nothing.

(ECF No. 209, p. 17).

On November 18, 2020, Plaintiff filed his original Complaint. (ECF No. 1). However, Defendants Walker, Runion, and Adams were not served with the Complaint until January 14, 2021. (ECF No. 71).

According to Al Landreth, the Jail Administrator at the MCDC, Plaintiff complained about the following incident on November 25, 2020:

...an inmate in his cell was 'fishing', that is using fishing line to communicate and obtain goods from other cells. This is prohibited, for obvious security and contraband reasons. Plaintiff admits that fishing was occurring in his cell, but claims it was by his cellmate...and not him. Who is doing the fishing is not always immediately obvious and often multiple members of a cell will be participating and what inmates say is not dispositive of the facts for the officer's investigation. The normal procedure is to search the entire cell and often to confiscate commissary for all cellmates pending an investigation as to whether a disciplinary was appropriate. This process may take some time as it cannot always be immediately determined. If it is determined that an inmate was not involved, commissary will be returned. This was apparently the case with regards to this incident and Plaintiff; once it was determined that he was not involved in the fishing, his commissary was returned and no disciplinary was given.

(ECF No. 182-5, p. 3). Plaintiff describes the incident as follows:

...MCDC placed an inmate into my 2 man cell who began to engage in 'fishing' with another inmate in another cell from our cell door on 12/10/2020. Cpl. Ellis and Sgt. Henderson saw this on camera and searched our cell. During the search Cpl. Ellis found a fishing line in my cellmates box and he as well as the inmate in the other cell admitted that they had engaged in fishing and that I had had nothing to do with this activity. Furthermore, I had no history of such activity.

Despite this, all of my property to include my legal papers, stationary, pens, envelopes, stamps and commissary was confiscated as well as was the next week's commissary shipment. I was provided no disciplinary paperwork, no hearing and no outcome. Cpl. Ellis responded to my 12/17/2020 kiosk request for my status writing, 'you are pending disciplinary.'

(ECF No. 209, 18-19).

Plaintiff testified between December 11 and December 18, 2020:

...I wrote a series of kiosk grievances to Warden Walker describing this retaliation from Cpl. Ellis and disclosing that I had filed a civil suit recently...I also wrote a letter sent per U.S. mail to Warden Walker describing this retaliation and revealing that I had filed a recent civil suit as well as the case number. I revealed my civil suit as an attempt to protect myself from further retaliation.

On 12/18/2020, I called my federal defense attorney...to complain of this prolonged deprivation of my property as well as this due process issue. Within one hour, all of my property was returned to me but without explanation or documentary outcome...

Despite my revelations of my filed civil suit against MCDC within my grievances

and letter to the Warden, the next day (12/19/2020) the Warden purposefully and personally moved inmate…into a cell directly next to me. …is extremely mentally ill…

…created unbelievably prolonged durations of yelling beating, wailing and crying at all hours of the day and night with seemingly endless stamina and exceptionally loud volume…also and continuously contaminated our pod with feces and urine which was especially egregious as we were still being denied opportunities to clean and disinfect.

The records show that I filed almost daily grievances, letters of complaint, letters requesting video preservation and kiosk requests begging for relief of this torture for 34 days.

I was finally moved out of this pod and to an 'old man's pod' (which I had been requesting since 1/7/2021) because in my last letter and last grievance to the Warden I had threatened to refuse all meal trays beginning 2/1/2021. MCDC moved me on 1/31/2021.

(ECF No. 209, p. 19). Mr. Landreth states in his affidavit there are times that inmates with mental illnesses are housed at the MCDC and there are times inmates make noise while housed at MCDC. He states this is unavoidable even with all resources exhausted. (ECF No. 182-5, p. 3).

Defendant Walker states all MCDC inmates were given cleaning supplies daily to allow them to clean their cells and mats and during Covid 19, this included cleaning supplies that had bleach in them. (ECF No. 182-1, p. 3).

Plaintiff states on December 3, 2020:

…a concerned local citizen sent me a news article concerning the Covid-19 outbreak at MCDC on July 6, 2020. This article was printed from the internet and sent to me in care of MCDC per U.S. Mail. MCDC has a written policy that bars delivery of newspapers to inmates. Around 12/4/2020, Cpl. Ellis intercepted this mail and placed it into my property without notifying me or the sender of this censorship and in violation of the MCDC SOP policy.

(ECF No. 209, p. 18).

Plaintiff testified during his deposition that he had access to the news through NPR via a radio. (ECF No. 182-8, p. 20).

In addition, Plaintiff states in his affidavit:

…the March 2021, Edition Vol. 75 No. 3 PN (Paraplegia News) that is printed and provided to paralyzed member veterans like me… by the Paralyzed Veterans of American, was sent to me in care of MCDC and was denied delivery to me without any notification to me or the sender. I only knew that this mail existed when I saw it in my 'stored property' upon my abrupt transfer out of MCDC on 3/24/2021. (The online version of this newsletter is at pnonline.com)…

(ECF No. 209, p. 21).

According to Defendant Walker, the MCDC no longer provides notice to inmates regarding mail that is held due to the time and manpower involved and instead it [the mail] is held for the inmate upon discharge. He also states Plaintiff was provided all mail, including newspapers, not allowed by policy into the facility upon his transfer to Saline County. (ECF No. 182-1, p. 4).

The MCDC's policy concerning inmate mail states in part:

…It is the policy of the Miller County Jail to provide inmate mail privileges. Inmates shall be encouraged to maintain legitimate correspondence with family and other persons immediately concerned with the inmate's welfare…

…Mail – for the purpose of this S.O.P. [is] synonymous with correspondence…Publications – [ is defined as] Books, magazines, and newspapers…

…All unacceptable correspondence will be "Returned to Sender". Examples include…anything jeopardizing or compromising the safety and/or security of the jail will not be accepted…

…Inmate mail shall not be censored and/or denied unless for legitimate facility interests for order and security, and in the interest of upholding the law…

…If correspondence is censored or rejected the inmate shall be informed of the action in writing by the Shift Supervisor in charge of mail or designee, including a statement of why the correspondence is being censored and/or rejected…

…Notice of censorship or rejection will also be provided via U.S. Mail to the sender/author within (5) business days by the Shift Supervisor or designee…

(ECF No. 182-4, pp. 8-11). The MCDC's policy regarding publications states in part:

11

…Inmates are allowed to access publications under the following guidelines: 1) Only publications sent directly from a legitimate (recognized) publisher or vendor (such as a retail book seller) will be considered for approval by the Jail Director or designee…2) when a publication has been approved, the publication will be logged into the inmate's property inventory. A property receipt will be generated and signed by the inmate receiving the publication. A copy of the signed property receipt will be given to the inmate and one placed in the inmate's case management folder…a) Inspection of incoming publications shall be: (1) For content and contraband, (2) All packing and original wrapping will be discarded…

…The Shift Supervisor and/or designee, will disapprove a publication if it is deemed an immediate and/or tangible threat to the security or good order of the jail or staff. This includes but is not limited to content of publications used to introduce contraband…

…Review of all publications will be done on an individualized basis. When a publication has been disapproved, the shift supervisor will advise the inmate in writing of the disapproval. The inmate may appeal the decision through the established inmate grievance system described in Jail Standard Operation Procedure 09.01…

(ECF No. 182-4, pp. 11 – 13).

On December 29, 2020, at his yearly check up at the MCDC, Plaintiff weighed 250.8 pounds and his blood pressure was 142/86. (ECF No. 209, p. 12).

On January 6, 2021, Plaintiff received a flu shot given by Defendant King. (ECF No. 201, p. 3). According to Defendant King, any delay in administering vaccines was due to a delay in delivery of the vaccines to the MCDC. (ECF No. 173-3, p. 2). The summary judgment record confirms Plaintiff never contracted the flu or pneumonia during his incarceration in the MCDC. (ECF No. 173-3, p. 2).

On February 24, 2021, Plaintiff submitted a kiosk request "… asking Capt. Adams about the final disposition of the 10/21/20 disciplinary hearing and why I had not received anything yet. He responded that he would check on it but he did not get back to me." (ECF No. 209, p. 20). On March 9, 2021, he wrote another kiosk request to Defendant Adams asking again about the final

disposition of the October 21, 2020, disciplinary hearing. Defendant Adams "responded that he would look into it. He never did and this was my last inquiry to him about this before being abruptly transferred out of MCDC on 3/24/2021." *Id.* at p. 22.

Plaintiff states in June of 2021, through discovery in the instant lawsuit, Defendants provided him with the "Disciplinary Hearing Finding document…the 'finding' was 'guilty' and it stated the hearing started at 10:08 am and that a Deputy K. Watson served me the guilty finding at 2:00 pm on 10/21/2020 and advised me of a 15 day appeal process". (ECF No. 209, p. 22). Plaintiff disputes the time of the hearing and states Watson was not at work that day and never provided him with the disciplinary finding. *Id.*

According to Defendant Walker, on March 25, 2021, Miller County began working to vaccinate inmates against Covid 19. (ECF No. 182-1, p. 3).

During Plaintiff's deposition taken on September 24, 2021, he testified his allegations and claims against Defendant Runion are based on the fact that he is the Sheriff of Miller County. (ECF No. 182-8, p. 13). Plaintiff also admits he never had any contact with Defendant Runion while he was incarcerated in the MCDC.

## II. PROCEDURAL BACKGROUND

Plaintiff filed his original Complaint on November 18, 2020.[3]  (ECF No. 1).  On December 17, 2020, in response to this Court's order, Plaintiff filed an Amended Complaint to clarify his claims. (ECF No. 9). On January 25, 2021, Plaintiff filed a Supplement to the Amended Complaint adding claims for retaliation and denial of medical care against two additional Defendants.  (ECF No. 13).

---

[3] The original Complaint consisted of eighty-five (85) pages which was confusing, included unnecessary and irrelevant information and was, for the most part incomprehensible.

On February 5, 2021, Plaintiff filed a Motion to Join seeking to add seven additional claims and "join these claims with 21 other cases that bring similar claims" filed by other prisoners.  (ECF No. 17).   On February 8, 2021, the Court denied Plaintiff's motion and instructed Plaintiff to file a Second Amended Complaint which would replace the First Amended Complaint and Supplement. (ECF No. 18).

On February 24, 2021, Plaintiff filed a Second Amended Complaint which consists of thirty-eight (38) pages asserting seventeen (17) claims against eight (8) Defendants.  (ECF No. 21).  Plaintiff labels his claims against the County Defendants as follows: (1) Claim Four - Failure to Protect or Intervene; (2) Claim Five - Malicious Violation of the Americans with Disabilities Act; (3) Claim Six - Malicious Violation of the Rehabilitation Act; (4) Claim Seven – Deliberate Deprivation of Outside "yard time" Exercise; (5) Claim Eight – Deliberate and Reckless disregard to an Imminent Threat and Future harm; (6) Claim Nine - Hindered Access to Medical Requests (sick call); (7) Claim Ten – Retaliation; (8) Claim Eleven - Denial of Mail; (9) Claim Twelve - Failure to Provide Medical/Future Harm; (10) Claim Thirteen – Denial of Newspapers; (11) Claim Fourteen - Prolonged Exposure to Extreme Behavior of Severely Mentally Ill Inmates; (12) Claim Fifteen - Retaliation; (13)  Claim Sixteen - Failure to Protect; and (14) Claim Seventeen - Failure to Train and Supervise.  *Id.*

On April 26, 2021, Plaintiff filed a Supplemental Complaint adding the following claims against Defendant Walker: Claim Eighteen - Illegal Seizure of Legal Documents and Claim Nineteen - Retaliatory Transfer. (ECF No. 63).

On December 21, 2021, the County Defendants filed a Motion for Summary Judgment arguing they are entitled to summary judgment because Plaintiff's claims are without merit, Plaintiff did not suffer any constitutional injury, Plaintiff did not suffer any physical damages as

required to recover compensatory damages, some Defendants had no personal involvement in the events upon which Plaintiff's claims are based, Defendants are entitled to qualified immunity, and there were no policies or customs of MCDC that violated Plaintiff's constitutional rights. (ECF Nos. 182, 183).

On February 2, 2022, Plaintiff filed a verified Response in opposition to Defendants' motion, a Brief in Support, a Statement of Facts, and a Supplement which consists of a 26-page Affidavit.[4] (ECF Nos. 206, 207, 208, 209). He argues he was "repeatedly subjected to deplorable conditions and the threat of Covid-19 through a combination of actions (some through deliberate indifference and some as retaliatory for Plaintiff's continuous grievances and letters to the warden complaining of those acts and conditions)." (ECF No. 206). Plaintiff also argues he suffered physical and emotional damage and Defendants are not entitled to summary judgment.

The County Defendants filed a Reply (ECF No. 218) in which they argue, in part, that Plaintiff's Affidavit contains "lots of allegations, the vast majority unsupported, speculative, or general conclusory statements. These are improper and self-serving, and it is not an admissible form of evidence." They argue the Court should disregard the inadmissible portions of Plaintiff's Affidavit. *Id.* at pp. 2-3.

### III. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once

---

[4] These pleadings addressed not only the instant summary judgment motion, but also the motion for summary judgment filed by the Medical Defendants.

a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing, *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Under § 1983, a defendant may be sued in either his personal capacity, or in his official capacity, or claims may be stated against a defendant in both his personal and his official capacities. *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998). To state a claim under 42 U.S.C. § 1983, Plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010).

To sustain an official capacity claim against such an entity a plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006). Thus, Plaintiff's official capacity claims against the County Defendants are "functionally equivalent" to alleging their employer, Miller County, had "a policy, custom, or [took an] official action" that deprived him of his constitutional rights. *Veatch*, 627 F.3d at 1275*; Johnson*, 452 F.3d at 973.

> To establish a claim for "custom" liability, Plaintiff must demonstrate:
>
> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the official of that misconduct; and
> 3) That Plaintiff was injured by acts pursuant to the government entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas County Medical Dept.,* 725 F.3d 825, p.  (8th Cir. 2013). "A single deviation from a written, official policy does not prove a conflicting custom." *Id.* (quoting *Jane Doe A v. Special Sch. Dist. of St. Louis,* 901 F.2d 642, 646 (8th Cir. 1990)).

## IV.  DISCUSSION

### A.  Defendant Runion

It is well established that a government official cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor. *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability on the part of a defendant, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [his] constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (citation and internal quotation marks omitted).

The Court finds all of Plaintiff's personal capacity claims against Defendant Runion should be dismissed. Plaintiff testified during his deposition he never had any contact with Defendant Runion while he was incarcerated in the MCDC. He also stated he sued Defendant Runion because he was the Sheriff of Miller County. Accordingly, the Court recommends Defendant Runion be granted summary judgment on all of Plaintiff's personal capacity claims.

### B.  Claim Four – Failure to Protect/Intervene

In Claim Four, Plaintiff alleges Defendants Walker, Runion, Adams, and Henderson violated his constitutional rights when Defendant King "brow beat and verbally assaulted me during a doctor appointment on 10.15…attempted to sabotage my medical request for accommodation of my disability, deny me medical care (blood pressure, blood sugar and weight check) falsely accuse me of disrespect…and they failed to protect me during or after this event." (ECF No. 21, p. 13). This claim is without merit.

First, Plaintiff's allegations relating to Defendant King's "brow beating and badgering" fails to state a constitutional claim. It is well established that "verbal threats do not constitute a constitutional violation." *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985).  Similarly, taunts, name calling, and the use of offensive language does not state a claim of constitutional dimension. *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993) (inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) (verbal threats and abuse by jail official did not rise to the level of a constitutional violation).

Second, although prison officials must provide humane conditions of confinement, including protecting inmates from violence, s*ee Jensen v. Clarke,* 94 F.3d 1191, 1197 (8th Cir. 1996), the Eighth Circuit has not recognized a duty to intervene to prevent any constitutional

violations outside of the excessive force context. *Livers v. Schenck,* 700 F.3d 340, 360 (8th Cir. 2012); *Hess v. Ables,* 714 F.3d 1048, 1052 (8th Cir. 2013). Plaintiff does not make any allegations of excessive physical force against Defendant King. Accordingly, the Court recommends Defendants Runion, Walker, Adams and Henderson be granted summary judgment on Plaintiff's personal capacity claim.

For his official capacity claim, Plaintiff states:

> MCDC policy is to punish immediately and then sort it out days later at a disciplinary hearing which violates my fourteenth Amendment. All MCDC inmates that are accused of infractions are moved to disciplinary lock down and stripped of privileges at the time of the accusation and without any review of the evidence. A simple review of the video/audio would have exonerated me before I was punished and an intervention by Dr. McCann who witnessed it would have prevented the abuse.

(ECF No. 21, p. 13).

"In order to prevail on a Fourteenth Amendment due process claim, [the plaintiff] must first demonstrate that he was deprived of life, liberty, or property by government action." *Phillips v. Norris*, 320 F.3d 844, 846 (8th Cir. 2003). When deciding whether an individual was afforded procedural due process a court employs a two-step analysis. *See Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454 (1989). First the court must determine whether the individual holds a protected liberty or property interest. *Id.* If the court finds a protected interest, the question becomes whether the state provided sufficient due process prior to depriving that individual of the protected interest. *Id.*

"To prevail on such a claim based on prison housing, an inmate must show that the segregation created an 'atypical and significant hardship on him in relation to the ordinary incidents of prison life' to demonstrate that his liberty interest was curtailed." *Rahman X v. Morgan*, 300 F.3d 970, 973 (8th Cir. 2002) (alteration omitted) (quoting *Sandin v. Conner*, 515

19

U.S. 472,484 (1995).  An inmate's liberty interests are limited to the nature of confinement and do not extend to procedural rules imposed by the state.  *See Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996) ("If [the plaintiff] has a liberty interest, it is an interest in the nature of his confinement, not an interest in the procedures by the which the state believes it can best determine how he should be confined."); *see also Swenson v. Trickey*, 995 F.2d 132, 134 (8th Cir. 1993) (holding that "[p]rocedural guidelines, such as a mandatory hearing, are not enough to create a liberty interest").

The Eighth Circuit has held that much longer periods in administrative segregation than that experienced by Plaintiff, with loss of privileges, does not implicate a liberty interest triggering due process protections.  *See Orr v. Larkins*, 610 F.3d 1032, 1034 (8th Cir. 2010) (inmate was not deprived of liberty interest during nine months in administrative segregation); *Rahman X*, 300 F.3d at 974 (inmate's placement in administrative segregation for twenty-six months without a disciplinary charge or conviction did not "demonstrate that his liberty interest was curtailed"); and *Furlough v. Brandon*, 2009 WL 4898418 (E.D. Ark. Dec. 15, 2009) (inmate plaintiff failed to state a due process claim after being assigned to administrative segregation for nearly nine months).

The Court finds Plaintiff has failed to establish that any liberty interest was curtailed while he was placed in segregation between October 16, 2020, and October 20, 2020, which would necessitate procedural due process and the MCDC policy Plaintiff describes does not violate his constitutional rights. Accordingly, the Court recommends Defendants Runion, Walker, Adams and Henderson be granted summary judgment on Plaintiff's official capacity claim.

**B. Claims Five and Six – Malicious Violation of the Americans with Disabilities Act and the Rehabilitation Act**

In Claims Five and Six Plaintiff alleges Defendants Walker, Adams, and Runion violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. Plaintiff claims:

> MCDC and Southern Health Partners, Inc., were sufficiently informed on 1/10/20 that I am disabled and covered by the VA health care system" and "yet as of 10/15/20 they had failed to order my VA medical file...I described my need for secure footwear in order to safely walk and exercise as I am a T-6 paraplegic (incomplete)...[and] I stated that I have VA medical documents with me and that I need to see a doctor in order to obtain secure footwear.

(ECF No. 21, p. 15).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The United States Supreme Court has held that Title II, which prohibits a "public entity" from discriminating against a "qualified individual with a disability" on account of that individual's disability, includes inmates in state prisons. *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 208 (1998). In order to state  a claim under Title II of the ADA, a plaintiff must allege (1) he is a qualified individual with a disability; (2) he was excluded from participation in or denied the benefits of the [prison's] services, programs, or activities, or was otherwise subjected to discrimination by the [prison]; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability. *Rinehart v. Weitzell,* 964 F.3d 684, 688 (8th Cir. 2020).

"To prevail on a claim under § 504 of the Rehabilitation Act, a plaintiff must demonstrate: (1) he is a qualified individual with a disability; (2) he was denied the benefits of a program or activity of a public entity which receives federal funds; and (3) he was discriminated against based

on his disability." *Gorman v. Bartch,* 152 F.3d 907, 911 (8th Cir. 1998). Although the ADA has no federal funding requirement, 'it is otherwise similar in substance to the Rehabilitation Act, and 'cases interpreting either are applicable and interchangeable.'" *Gorman,* 152 F.3d at 912 (quoting *Allison v. Dep't of Corr.,* 94 F.3d 494, 497 (8th Cir. 1996)).

The Court will assume for purposes of this Report and Recommendation that Plaintiff is a qualified individual with a disability. However, Plaintiff has not alleged he was denied the benefits of a program or activity of a public entity or that he was discriminated against based on his disability. Failure by Defendants Walker, Adams, and Runion to order Plaintiff's file from the Veteran's Administration did not result in denial of any benefit of a program or activity at the MCDC. Moreover, the summary judgment record confirms Plaintiff requested special medical shoes on October 9, 2020, and this request was approved on October 15, 2020. There is no evidence Plaintiff was discriminated against in any way by Defendants Walker, Adams, or Runion. Therefore, Plaintiff has failed to state a personal capacity claim against these Defendants based on a violation of the ADA or the Rehabilitation Act.

Plaintiff describes his official capacity claim as follows: "Nurse King stated that bringing documents to the doctor appointment is 'not allowed' thus implying policy. Southern Health Partners, Inc., does not order health files even after having been given 10 months notice of a disability and a need to reasonable accommodate that disability." (ECF No. 21, pp. 15, 17). Plaintiff does not describe any policy or custom of Miller County that violated his constitutional rights. Accordingly, the Court recommends Defendants Walker, Adams and Runion also be granted summary judgment on Plaintiff's official capacity claim under Claims Five and Six.

**C. Claim Seven – Deliberate Deprivation of Outside "yard time" Exercise**

Plaintiff alleges Defendants Runion, Walker and Adams violated his constitutional right to

"outside yard time exercise or sunlight from 1/10 until 10/21". (ECF No. 21, p. 18). He also states after October 21, 2020, "Capt. Adams authorized outside yard time for me once per week on Sundays but this has proved to be inconsistent…inadequate to maintain health." *Id.* Plaintiff describes his official capacity claim as follows: "It has been a long standing MCDC policy that inmates in "protective custody" 23/1 lockdown cells do not get the same opportunity for outside yard time/exercise and healthy sunlight as the inmates in general population do." *Id.*

First, there is no constitutional right to exercise outside. A constitutional violation exists only if Defendants were deliberately indifferent to Plaintiff's exercise needs. *See Wishon v. Gammon,* 978 F.2d 446, 449 (8th Cir. 1992) (finding that forty-five minutes of out-of-cell recreation time per week did not violate the Eighth Amendment rights of an inmate in protective custody where prison records showed inmate had the opportunity to exercise in his cell and had other opportunities to be out of his cell). A "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened." *Id.* Courts reviewing an inmate's lack of exercise claim should consider factors such as: (1) the opportunity to be out of the cell; (23) the availability of recreation within the cell; (3) the size of the cell; and (4) the duration of confinement. *Id.* Lastly, "[c]laims under the Eighth Amendment require a compensable injury to be greater than de minimis." *Irving v. Dormire,* 519 F.3d 441, 448 (8th Cir. 2008). "While a serious injury is not necessary, some actual injury is required in order to state an Eighth Amendment violation." *White v. Holmes,* 21 F.3d 277, 281 (8th Cir. 1994).

Here, Plaintiff was in protective custody at his own request. Protective custody inmates are given one hour out of the cell each day for exercise pursuant to Arkansas Jail Standards. (ECF No. 182-1, p. 4). Plaintiff was given that time to move around so that he could exercise should he choose to do so. If the weather permitted, and if logistically possible so that protective custody

status was maintained, time in the yard was provided at times but not guaranteed. *Id.*

Finally, Plaintiff has not provided evidence he suffered an injury because of limited access to outside yard time. The fact that Plaintiff gained weight during his incarceration is not enough to demonstrate any of the Defendants were deliberately indifferent to his exercise needs. Accordingly, the Court recommends Defendants Runion, Walker, and Adams be granted summary judgement on Plaintiff's personal and official capacity claims under Claim Seven.

**D. Claims Eight, Sixteen, and Seventeen – Deliberate and Reckless Disregard to an Imminent Threat and Future Harm, Failure to Protect, and Failure to Train and Supervise**

In Claims Eight, Sixteen, and Seventeen Plaintiff alleges beginning March 1, 2020 "until present (it is ongoing)", Defendants Runion, Walker, and Adams: 1) deliberately and recklessly disregarded an imminent threat of future harm to him from Covid-19; 2) failed to protect him from Covid-19; and 3) "failed to train and supervise".  He specifically describes the facts underlying these personal capacity claims as follows:

> We have been continuously exposed to the threat of irreparable harm on a daily basis since March, 2020, due to MCDC's failures to test for Covid-19, failure to re-test for Covid-19 after infections were discovered on 7/6/20, failure to report and contact trace after 3 MCDC staff tested positive for Covid-19 within the first 2 weeks of June, 2020, (Studdard, Crane & Morgan)[5] dishonest press releases to local newspapers designed to hide Covid-19 infections in MCDC, failure to decrease the MCDC inmate population to allow room for Covid-19 quarantine (MCDC is overcrowded for months with inmates sleeping on floors) deliberate disregard for PPE by MCDC staff on a daily basis, failures to provide adequate sanitation/disinfectants, failure to consistently take inmate temperatures, falsification of inmate temperatures, failure to consistently provide face masks to inmates and failure repair the inoperable emergency 'panic' buttons within all of the Max A and Max E 23/1 lockdown cells.

---

[5] None of these individuals are named as Defendants.

(ECF No. 21, p. 20). Plaintiff describes the facts underlying his official capacity claims under Claims Eight, Sixteen, and Seventeen as follows:

> The countless grievances and letters to the Warden over many months by inmates and myself detailing the daily infractions and the fact that all of these grievances/letters were ignored should sufficiently establish the custom of deliberate and reckless indifference to inmate safety and future harm and that the MCDC grievance process is a 'dead end' and when the above infractions are viewed in their totality they will easily rise to the level of constitution violation.

*Id*.

In *Helling v. McKinney,* 509 U.S. 25, 33-34 (1993), the Supreme Court held the Eighth Amendment protects against future harm to inmates if the plaintiff proves threats to personal safety from conditions, such as mingling of inmates with serious contagious diseases with other inmates, and if the conditions reveal deliberate indifference to a substantial risk of serious harm. An Eighth Amendment claim for failure to protect is comprised of two elements. First, an "inmate must show that [he] is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the inmate must establish that the Defendants recklessly disregarded that risk. *Jackson v. Everett,* 140 F.3d 1149, 1151 (8th Cir. 1998). The prison official's state of mind is measured by a subjective, rather than an objective standard. *Farmer,* 511 U.S. at 838-839.

The Court assumes for purposes of this Report and Recommendation that Covid-19 poses an objectively serious medical risk to Plaintiff. The question then becomes whether Plaintiff has alleged facts (rather than conclusions) from which the Court can plausibly infer the subjective prong is met. "The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more than gross negligence," namely, a "mental state akin to criminal recklessness." *Saylor v. Nebraska,* 812 F.3d 637, 644 (8th Cir. 206) (citations and quotations omitted).  ("[D]eliberate indifference must be viewed from [defendant's] perspective at the time

in question, not with hindsight's perfect vision"). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he] must also draw the inference." *Farmer,* 511 U.S. at 837.

In cases brought under Section 1983, supervisors are not liable for constitutional violations committed by their subordinates simply because they are their supervisors. *Tate v. Arkansas Department of Corrections,* 2020 WL 7378805 at *5 (E.D. Ark. Nov. 9, 2020) citing *Ashcroft v. Iqbal,* 556 U.S. 662, 676. However, a prison supervisor can be held liable for failing to train or supervise subordinates or for tacitly authorizing misconduct by failing to take corrective action after learning of a violation. *Boyd v. Knox,* 47 F.3d 966, 968 (8th Cir. 1995); *Choate v. Lockhart,* 7 F.3d 1370, 1376 (8th Cir. 1993). To state a claim for failure to train or supervise, there must be allegations: 1) that the supervisor knew of a pattern of unconstitutional acts committed by the subordinate; 2) that the supervisor demonstrated deliberate indifference to, or unspoken authorization of, constitutional violations committed by subordinates; 3) that the supervisor failed to take appropriate remedial action after learning of a subordinate's misconduct; and 4) that the plaintiff was injured as a result of the failure to properly train or supervise subordinates. *Otey v. Marshall,* 121 F.3d 1150, 1156 (8th Cir. 1997). The standard for proving deliberate indifference is high. Even where prison officials know of a substantial risk to inmate health or safety, they are not liable, "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

Here, Plaintiff has not alleged facts from which the Court can infer that any named Defendant deliberately disregarded a substantial risk of serious harm when various MCDC staff members failed to follow the policies set forth by Defendants Walker and Runion. In determining whether an action fails to state a claim upon which relief can be granted, the Court must engage in

a two-step inquiry. First, the Court must identify the allegations in the complaint that are not entitled to the assumption of truth. *Ashcroft v. Iqbal,* 566 U.S. 662 (2009). These include "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements." *Id.* at 678. Second, the Court must determine whether the complaint states a plausible claim for relief. *Id.* at 679. A plaintiff is required to plead facts that show more than the "mere possibility of misconduct." *Id.*

Other than listing Defendants Runion, Walker, and Adams as individuals involved in being deliberately indifferent to the risk of Covid-19, failing to protect Plaintiff from Covid-19, and failing to train, Plaintiff does not make any specific allegations – in a personal or official capacity - against these Defendants in Claims Eight, Sixteen or Seventeen. The Court also notes Plaintiff never tested positive for Covid 19 while incarcerated at the MCDC and never submitted any sick calls relating to any physical conditions other than his paraplegia and a request to have his weight, blood pressure, and blood sugar checked.

The summary judgment record confirms on March 23, 2020, the MCDC promulgated extensive policies and procedures to deal with the threat of Covid-19. The Court finds these policies and procedures represent a good-faith effort to limit the spread of the Covid 19 virus within the facility. The implementation and compliance with the MCDC's Covid 19 protocols may have been imperfect, but "[t]he Eighth Amendment does not mandate perfect implementation. *Valentine v. Collier,* 956 F.3d 797, 801 (5th Cir. 2020) (The incidence of diseases or infections, standing alone, do not imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks.)

Accordingly, the Court finds Plaintiff has failed to state any claims for relief under Claims Eight, Sixteen, or Seventeen and recommends Defendants Runion, Walker, and Adams be granted summary judgment on these claims.

### E.  Claim Nine – Hindered Access to Medical Request (sick calls)

Plaintiff alleges Defendants Runion, Walker, and Adams hindered his ability to submit sick calls. He specifically alleges:

> Despite my many medical requests, grievances and 2 handwritten notes to Nurse King MCDC continues to hinder inmates in 'protective custody' and disciplinary 23/1 lockdown from timely accessing the kiosk medical request sick call process by closing the medical request system at 12:00 noon every day. Inmates that are in lockdown are only allowed out of the cell to use the kiosk for 1 hour per day and the way that they alternate which cells are let out before noon each day translates to each cell getting out before noon on only 1 to 2 days per week.

> MCDC responds to our complaints by stating that there are paper sick call requests available upon request but we do not receive them when we request them. I have written Nurse King several times about the significant delays that I have incurred in getting scheduled for sick call due to this noon cut off on the kiosk but his written response have been snarky, taunting and indifferent.

(ECF No. 21, p. 24). Plaintiff describes his official capacity claim for Claim Nine as follows:

> In one of the snarky kiosk responses from Nurse King he wrote, 'we will not change our policy to suit one inmate. But seeing as you just filed 5 medical requests to medical it seems as though you have the kiosk thing figured out.' His response does confirm that a policy exists…

*Id.*

The summary judgment record confirms Plaintiff submitted 17 sick calls and 251 grievances between January 10, 2020, and March 24, 2021. Although Plaintiff claims he experienced delays in getting scheduled to be seen for sick call, he has not presented any medically verified evidence to show these delays caused him any detrimental effect.  When a delay in medical treatment is the alleged constitutional deprivation, the objective seriousness of the deprivation,

must also be measured by reference to the effect of delay in treatment.  As a result, to succeed on

a delay in medical treatment claim, the plaintiff "must place verifying medical evidence in the

record to establish the detrimental effect of delay in medical treatment."  *Laughlin v. Schriro*, 430

F.3d 927, 929 (8th Cir. 2005) (quotation marks omitted) (quoting *Crowley v. Hedgepeth*, 109 F.3d

500, 502 (8th Cir. 1997)).  In the absence of such evidence, a plaintiff "fail[s] to raise a genuine

issue of fact on an essential element of his claim."  *Id.*   Here, Plaintiff has provided no summary

judgment evidence of a detrimental effect of any delay in treatment.

Further, although there exists a policy which requires MCDC inmates to submit sick calls

through a kiosk system, there is no summary judgment evidence to substantiate this policy was a

moving force behind any constitutional violation. Accordingly, the Court recommends Defendants

Runion, Walker, and Adams be granted summary judgment on Plaintiff's personal and official

capacity claims under Claim Nine.

### F.  Claim Ten – Retaliation (fishing episode)

In Claim Ten, Plaintiff alleges Defendants Runion, Walker, Adams, Ellis, and Henderson

retaliated against him after it was discovered an inmate was "fishing" in his cell by:

> confiscated my commissary…on 12/10 and ordered me 'written up'…on 12/17
> Cpl. Ellis withheld my new commissary order…Ellis wrote on 12/18 that I was
> 'pending disciplinary'. As Cpl. Ellis was retaliating and punishing me without due
> process and in violation of the Fourteenth Amendment and MCDC policy, …on
> 12/18 [after I emailed the US Marshalls]…my property ($350 worth of commissary
> including legal work materials – stamps, envelopes, writing paper) was returned to
> me and the 'pending disciplinary status from Henderson and Ellis was dropped…

(ECF No. 21, pp. 26, 27).

To prevail on his retaliation claim, Plaintiff must demonstrate: (1) he engaged in protected

activity; (2) Defendants responded with adverse action that would "'chill a person of ordinary

firmness' from continuing in the activity;" and (3) the adverse action was motivated at least in part

by exercise of the protected action. *See L.L. Nelson Enterprise Inc. v. County of St. Louis, Mo.,* 673 F.3d 799, 807-808 (8th Cir. 2012) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). Because nearly every otherwise routine administrative decision may potentially be viewed as a retaliatory act, it has been recognized that "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Here, the activity which prompted the search of Plaintiff's cell, and the withholding of his commissary for eight days, was "fishing". Because fishing is not a protected activity under the constitution Plaintiff fails to state any claim based on retaliation.

Plaintiff describes his official capacity claim as follows:

I endured this retaliation for 8 days despite my immediate kiosk requests, grievances and written letters to Warden Walker, Cpl. Ellis, Sgt. Henderson and Capt. Adams…MCDC policy is to punish/deprive first and then hold a 'hearing' which violates my Fourteenth Amendment right to due process as I am pre-sentence. Furthermore, I was not even afforded a hearing which violates MCDC's policy…

(ECF No. 21, pp. 26, 27).

As previously stated, to prevail on a Fourteenth Amendment due process claim, Plaintiff must demonstrate he was deprived of life, liberty, or property by government action. To prevail on such a claim based on prison housing, Plaintiff must show that the segregation created an "atypical and significant hardship on him in relation to the ordinary incidents of prison life" to demonstrate that his liberty or property interest was curtailed. *Rahman X.,* 300 F.3d at 973.  First, Plaintiff does not have a federally protected liberty or property right to commissary privileges. *Vega v. Rell,* 2011 WL 2471295, at *25 (D. Conn June 21, 2011). Second, the fact that the MCDC took eight days to investigate the incident and determine Plaintiff was not involved does not evidence any policy that

infringes upon Plaintiff's constitutional rights because eight days without a privilege does not create a significant hardship on Plaintiff in relation to ordinary prison life.

Accordingly, Plaintiff's personal and official capacity claims under Claim Ten fail as a matter of law and the Court recommends Defendants Runion, Walker, Adams, Ellis, and Henderson be granted summary judgment.

### G. Claim Eleven and Thirteen – Denial of Mail and Newspapers

In Claim Eleven, Plaintiff alleges on December 8, 2020, Defendants Runion, Walker, Adams and Ellis violated his constitutional rights as follows:

> On 12/3/20…a concerned local resident, sent me a letter per US Post containing a Google print out of a Texarkana Gazette news article from July, 2020, that contained an MCDC press release regarding the first reported Covid-19 infections at MCDC as well as specific falsehoods that were intended by MCDC to deflect public attention and concern away from MCDC. …Cpl. Ellis intercepted this mail, deliberately did not deliver it to me and deliberately did not notify me that it had been denied and placed into my property on 12/8/20. The only reason that I know that it was received and denied delivery to me is because Cpl. Ellis wrote this in response to kiosk request to 3rd shift complaining that I had not received it.

(ECF No. 21, p. 28). For his official capacity claim Plaintiff states:

> …I have still not received this mail as of 2/14/21despite my numerous requests and grievances. The written responses …state that MCDC 'does not deliver newspapers'. That response is indicative of a policy and that policy is hindering my access to the court, violates free speech, violates my right to receive mail and violates my right to receive 'newspaper'…It is my opinion that my letter was deliberately misclassified using an unconstitutional policy in order to block me from receiving a news article containing MCDC released falsehoods that could be used in my civil case against MCDC…

*Id.*

Plaintiff describes Claim Thirteen as "Denial of Newspapers" on December 8, 2020, by Defendants Runion, Walker, Adams, and Ellis. He states the facts giving rise to this claim "is exactly as described in Claim #11". *Id.* at p. 31. In his affidavit, Plaintiff states he was not provided

the March publication of the Paraplegia News, printed by the Paralyzed Veterans Association. However, Plaintiff does not identify who withheld or intercepted this piece of mail.

Inmates have a First Amendment right of free speech to send and receive mail. *Hudson v. Palmer*, 468 U.S. 517, 547 (1984). However, "confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment." *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125 (1977). Inmates are not guaranteed receipt of all correspondence addressed to them but instead only have a limited liberty interest in their mail. *Thornburgh v. Abbbott,* 490 U.S. 401, 407 (1989). Restrictions on this First Amendment right are valid "only if [they are] reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987).

In *Turner,* the United States Supreme Court established four factors that courts should consider in determining whether a regulation is reasonably related to a legitimate penological interest: (1) whether there is a "valid rational connection" between the prison regulation and the government interest advanced; (2) whether prison inmates have an alternative means exercising the restricted right; (3) whether an accommodation would have significant impact on the prison staff, other inmates, and prison resources; and (4) whether there is a "ready alternative" that would accommodate inmates' rights "at *de minimis* cost to valid penological interests." *Turner,* 482 U.S. at 78, 89-91.

First, the Court notes Plaintiff only specifically identifies one person – Defendant Ellis – who was involved in intercepting his mail. Accordingly, the Court recommends that Defendants Walker and Adams be granted summary judgment on the personal and official capacity claims under Claims Eleven and Thirteen because Plaintiff has failed to allege either of these Defendants were personally involved in the incident. However, the Court finds there are questions of material

fact concerning the actions of Defendant Ellis in interfering with Plaintiff's mail and questions of material fact regarding what the MCDC's policy is with respect to receiving mail.

The summary judgment record contains conflicting testimony regarding whether there is an absolute ban on newspapers at the MCDC which as a rule is unconstitutional. *See Bell v. Wolfish,* 441 U.S. 520, 547-48 (1978) (absolute bans on inmate access to newspapers and magazines violate the First Amendment because they are an exaggerated response to legitimate penological needs). In addition, Defendants have not provided the Court with any evidence concerning how withholding a copy of a newspaper article and a publication from the Veteran's Administration is related to a legitimate penological interest. Accordingly, the Court recommends that summary judgment be denied on the personal and official capacity claims under Claims Eleven and Thirteen against Defendant Ellis.

## H. Claim Twelve – Failure to Provide Medical/Future Harm

Plaintiff alleges Defendants Runion, Walker, and Adams violated his constitutional rights because he was never provided a pneumonia shot and the influenza shot he did receive was "finally given…with just 72 days left before Spring …". (ECF No. 21, p. 30). Plaintiff describes his official capacity claim under Claim Twelve as follows:

> The written responses to my medical requests by Head Nurse King and the verbal assurance by Warden Walker during a 9/10/20 meeting in her office regarding my letter to her dated 9/9 point to a policy of MCDC and Southern Health Partners, Inc., to provide influenza and pneumonia vaccinations to MCDC inmates. Not only could the flu and pneumonia be dangerous to me but as MCDC does not test for Covid there is a very real risk that I could be moved to a pod containing inmates exhibiting Covid symptoms if I were to contract the flu or pneumonia and exhibit Covid-like symptoms…

(ECF No. 21, p. 30).

The summary judgment record confirms Plaintiff did not contract the flu or pneumonia during his time at the MCDC. Moreover, Plaintiff did receive a flu shot even though he argues it was given to him too late. Although there is some confusion in the record as to whether the MCDC or Southern Health Partners, Inc. had a policy to provide pneumonia shots to inmates, this discrepancy does not support any claim for denial of medical care by Defendants Runion, Walker or Adams because Plaintiff has not provided the Court with any medically verifiable evidence that a delay in giving him either vaccination caused him any damage.

Although Plaintiff has a constitutional right to adequate health care, he does not have the right to health care of his choice. *See Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118-19 (an inmate has no constitutional right to a particular course of treatment). In addition, as previously stated, failure to follow a policy does not, by itself, violate a constitutional right. Accordingly, Defendants Runion Walker and Adams are entitled to summary judgment on the personal and official capacity claims set forth in Claim 12.

## I.   Claims Fourteen and Fifteen – Prolonged Exposure to Extreme Behavior of Severely Mentally Ill Inmates/Retaliation

In Claim Fourteen Plaintiff generally alleges Defendants Runion, Walker, and Adams subjected him to unlawful conditions of confinement including excessive noise and unsanitary conditions for approximately thirty days when a mentally ill inmate was placed in his pod in late December 2020 and early January 2021. In Claim Fifteen, Plaintiff claims Defendants placed the mentally ill inmate in his pod in December of 2020 in retaliation for the numerous grievances he filed and the filing of the instant 1983 lawsuit.  (ECF No. 21, pp. 32, 35).

Plaintiff specifically states in part:

On 12/19/21 another mentally ill inmate… was placed into my pod in cell ME 13….I along with other inmates in Max E Pod filed multiple desperate grievances

regarding the incessant screaming, wailing, crying and banging by [the inmate] … that was depriving us of sleep and driving us nuts… We also complained of the feces and urine from…that we were being exposed to… [the inmate] was finally moved to a 'psych'cell on 1/1/21…[the inmate] was returned to Max E Pod and immediately began to scream incessantly and beat upon cell doors which is particularly torturous to me as I suffer from misophonia…

*Id.* For his official capacity claim, Plaintiff states:

MCDC…ha[s] a custom of indiscriminately and also deliberately housing mentally ill inmates together with inmates in protective custody and disciplinary lockdown and they ignore the resulting complaints of excessive noise, sleep deprivation and sanitation issues. Warden Walker knew that inmate…is mentally ill when she directed that he be moved from a psych cell and returned to Max E Pod and she was fully aware of the complaints and the problems that…creates for the other inmates…

I filed a kiosk request on 1/7/21 to move to a new "old man pod" for men 50 yrs and up due to inmate,,,and because I had been in 'protective custody" 23/1 lockdown in Max E Pod for 1 year and I was told that the old man pod (West D Pod) was relatively quiet. Capt. Adams wrote in response to that request on 1/10/21, 'I am still thinking about it.'

Despite my many grievances throughout January 2021, about the noise and sleep deprivation due to …I was not moved out of Max E Pod until 1/31/21 and that was only after I had threatened to refuse all meals beginning 2/1/21…

(ECF No. 21, p. 33). The Court will address Plaintiff's claims for excessive noise, unsanitary conditions, and retaliation separately.

**1. Excessive Noise**

Allegations of excessive noise in a prison can support a valid Eighth or Fourteenth Amendment claim. Noise is considered extreme when it is harmful to the health and well being of inmates and inflicts pain without penological justification. *Brown v. Moore,* 93 F. Supp. 3d 1032 (W. D. Ark. 2015); *Williams v. Boles,* 841 F.2d 181, 183 (7th Cir. 1988) (incessant noise may cause agony even though it leaves no physical marks). However, subjecting a prisoner to a few hours of

periodic loud noises that merely annoy, rather than injure the prisoner does not demonstrate a disregard for the prisoner's welfare"); *Murphy v. Dowd,* 975 F.2d 1229, 1234, (8th Cir. 1992).

Here, the summary judgment record confirms Plaintiff suffers from a condition known as misophia – which causes extreme and emotional reaction to loud noises. In addition, Plaintiff also alleges he and other inmates were exposed to thirty days and nights of prolonged duration of yelling, beating, wailing, and crying at all hours of the day and night which caused him sleep deprivation. *See Gardner v. Andrews,* 2018 WL 2307011 at *3 (E.D. Ark. 2018) (excessive noise causing sleep deprivation can support an Eight Amendment claim).

Defendants argue Plaintiff also consistently complained about other inmates being loud and disruptive and Plaintiff could have moved to another pod before the mentally ill inmate was moved to the same pod with Plaintiff. Defendant Walker and Al Landreth also state in their affidavits there are times that inmates with mental illnesses are housed at MCDC, and this is unavoidable even with all their resources exhausted. They also admit there are times that inmates make noise while housed at MCDC and this is unavoidable even with all resources exhausted.

The Court finds there are genuine issues of disputed fact concerning whether the thirty days Plaintiff was exposed to the loud noises made by the mentally ill inmate subjected him to an unlawful condition of confinement in the MCDC. The Court also finds there are questions of disputed fact concerning whether the MCDC has a policy or custom which may have contributed to the excessive noise and potentially violated Plaintiff's constitutional rights. Accordingly, the Court recommends summary judgment be denied as to the excessive noise portion of Claim Fourteen against Defendants Walker and Adams.

### 2.  Unsanitary Conditions

"[I]mates are entitled to reasonably adequate sanitation [and] personal hygiene…particularly over a lengthy course of time." *Beaulieu v. Ludeman*, 690 F.3d 1017 (8th Cir. 2012) citing *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989).  "Conditions, such as a filthy cell, may be tolerable for a few days and intolerably cruel for weeks or months."  *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 958 (8th Cir. 1994) (quotations and citations omitted); *see also Smith v. Copeland*, 87 F.3d 265, 268-69 (8th Cir. 1996) ( holding that where plaintiff was subjected to an "overflowed toilet in his cell for four days," such "allegations regarding 'raw sewage' d[id] not rise to a level of constitutional significance' because plaintiff 'did not allege that he…suffered any other consequences of the exposure'); *White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) (holding no Eighth Amendment violation where prisoner was confined to unsanitary cell for eleven days and noting that cleaning supplies were available to the prisoner).

Even accepting Plaintiff's claims that Defendants were aware of the conditions Plaintiff has described regarding feces and urine and the lack of cleaning supplies, his claims against them based on unsanitary conditions of confinement still fail because there is no evidence Plaintiff suffered any harm from these conditions during the thirty days he alleges the mentally ill inmate was in his pod.  The Court finds any discomfort Plaintiff may have suffered to be *de minimis,* and as a result does not implicate the Constitution.  *See Smith,* 87 F.3d at 268.  Accordingly, Plaintiff's condition of confinement claims relating to unsanitary conditions in Claim Fourteen fail as a matter of law and Defendants should be granted summary judgment on this issue. The Court also notes Plaintiff has not described any policy or custom of the MCDC relating to sanitary conditions under Claim Fourteen and therefore any official capacity claim should also be dismissed.

### 3. Retaliation

In Claim Fifteen, Plaintiff alleges Defendants retaliated against him for filing grievances and filing the instant lawsuit when they placed a mentally ill inmate in his pod on or about December 18, 2020. The Court finds this claim is without merit as it is undermined by the summary judgment record and is supported only by Plaintiff's speculation and conjecture.

First, the summary judgment record reflects when Defendants placed the mentally ill inmate in Plaintiff's pod on December 18, 2020, exposing not only him but also other inmates to the noise, Plaintiff had already submitted numerous grievances, sometimes daily, since July of 2020. In addition, although Plaintiff filed the instant lawsuit on November 18, 2020, Defendants were not served with the notice of the lawsuit until January 14, 2021. Even though Plaintiff states he wrote a letter to Defendant Walker a day or so before the inmate was moved into his pod that he had filed a lawsuit against her, "more than a temporal connection is required to present a genuine factual issue on retaliation." *Arraleh v. Cnty. Of Ramsey,* 461 F.3d 967, 977 (8th Cir. 2006). In addition, Plaintiff continued to file daily grievances and amend the complaint numerous times. Without question, the placement of the noisy inmate in his pod did not chill or dissuade him continuing in any constitutionally protected activities.

Finally, Plaintiff has not described any facts to support a policy or custom of the MCDC that would support an official capacity claim for retaliation. Accordingly, the Court recommends Defendants be granted summary judgment in both their personal and official capacities on Plaintiff's claim of retaliation in Claim Fifteen.

### J. Claims Eighteen and Nineteen – Retaliatory Seizure of Legal Documents and Retaliatory Transfer

In Claim Eighteen, Plaintiff alleges Defendant Walker illegally "seized" his legal documents from him in her office on March 11, 2021, in retaliation for the instant lawsuit and the numerous grievances he filed. (ECF No. 63, pp. 1-4). In Claim Nineteen, Plaintiff alleges Defendant Walker violated his constitutional rights and retaliated against him by transferring him to the SCDC in March of 2021. (ECF No. 63, p. 6-10). The County Defendants did not address either of these claims in their summary judgment motion.  Based on the summary judgment record, the Court finds there are questions of disputed fact as to whether Defendant Walker violated Plaintiff's constitutional rights. Accordingly, I recommend summary judgment be denied and Claims Eighteen and Nineteen proceed to trial against Defendant Walker in both her personal and official capacities.

## V. CONCLUSION

For the reasons stated above, I recommend Defendants Runion, Walker, Adams, Ellis, Guthrie, and Henderson's Motion for Summary Judgment (ECF No. 182) be **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)  Defendant Runion be **GRANTED** summary judgment on all personal and official capacity claims against him, and these claims be **DISMISSED WITH PREJUDICE**;

(2) All County Defendants be **GRANTED** summary judgment on the personal and official capacity claims set forth in **Claims Four, Five, Six, Seven, Eight, Nine, Ten, Twelve, Fifteen, Sixteen, and Seventeen**, and these claims be **DISMISSED WITH PREJUDICE**;

(3) Defendants Walker and Adams be **GRANTED** summary judgment on the personal and official capacity claims in **Claims Eleven and Thirteen** and these claims be **DISMISSED WITH PREJUDICE**;

(4) Defendant Ellis be **DENIED** summary judgment on the personal and official capacity claims set forth in **Claims Eleven and Thirteen;**

(5) Defendants Walker and Adams be **GRANTED** summary judgment on Plaintiff's personal and official capacity claims under **Claim Fourteen** involving conditions of confinement relating to unsanitary conditionsse claims be **DISMISSED WITH PREJUDICE**;

(6) Defendant Walker and Adams be **DENIED** summary judgment as to Plaintiff's personal and official capacity claims under Claim Fourteen for excessive noise;

(7) Defendants Walker and Adams be **GRANTED** summary judgment on the personal and official capacity claims in **Claim Fifteen**; and

(8) Defendant Walker be **DENIED** summary judgment on the personal and official capacity claims in **Claims Eighteen and Nineteen.**

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED this 29th day of July 2022.**

/s/ *Barry A. Bryant*

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE